# EXHIBIT A

ØŠÒÖ

Œ€GFÁÖÒÔ Á̃G¬ÁÉJ¬Œ¬ÁŒ̃T
SŒÔ ÓÁÖUW¬ VŸ
ÙWÚÖÜ ÖÜÁ ÖUWÜVÁÕŠÒÜS
ÒÉŽŒŠÒÖ
ÔŒÜ ÒÁ¬Á̃GFÉ̃FFFG̃É̃FÁÜ ŒŒ

# IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## IN AND FOR THE COUNTY OF KING

Johannessen Law
PLLC

5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

| | |
|---|---|
| ANGELICA CAMPBELL, a resident of the State of Washington; and AMANDA BRANCH, a resident of the State of Washington; and MEGDALENA PEREZ HILTS, a resident of the State of Washington; and TESSA MORTENSON, a resident of the State of Minnesota; and NABILA HAJI-ALI, a resident of the State of Minnesota, | No.  21-2-11125-1  SEA<br><br>**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL IS DEMANDED** |
| Plaintiffs, | |
| v. | |
| SOLOMON SIMONE, a resident of the State of Washington; and JONATHAN GANT, a resident of the State of Washington; and SARA BELCHE, a resident of the State of Washington; and SHAINA RAE ESSIG, a resident of the State of Washington; and RAHMEECE HOWELL, a resident of the State of Washington; and KATIE FULFORD, a resident of the State of Washington; and BLACK UMBRELLA, INC., a Washington for-profit corporation; and COMMODITY PROPERTIES, LLC, a Washington limited liability company; and TALENTS NORTHWEST, LLC, a Washington limited liability company; and DUSTIN ADAMS, a resident of the State of Washington; and EMILY SCHLACKMAN, a resident of the State of Washington. | |
| Defendants. | |

COME NOW the Plaintiffs, Angelica Campbell ("Ms. Campbell"), Amanda Branch ("Ms. Branch"), Megdalena Perez Hilts ("Ms. Perez," as she prefers to be called by her maiden name), Tessa Mortenson ("Ms. Mortenson), and Nabila Haji-Ali ("Ms. Ali") (collectively the "Plaintiffs"), and sue the Defendants under the following causes of action, and for cause state as follows:



*Plaintiffs' Second Amended Complaint for Damages* - Page **2** of **84**

### INTRODUCTION

This case is about seeking justice for victims of human sex trafficking and fraudulent exploitation of sex work.  Ms. Branch, Ms. Mortenson, Ms. Ali, Ms. Campbell, and Ms. Perez were not Defendants' first victims, and they will not be the last.  But with this action, they take the noteworthy step of holding their trafficker, Defendant Solomon "Raz" Simone, and the network that supports him, accountable.

In Ms. Campbell's case, the Defendants conspired to ensnare, imprison, and exploit a young and promising artist from Chicago, Illinois by promising her a better life here in Seattle through promotion of her artistic talents.  But when she came to the Emerald City out of desperation seeking an escape from abuse in her hometown, she found that she had come to a far worse situation.  She was thrust into a life of control and abuse and was forced to engage in prostitution and peddling drugs to make money.  She was forced to give away every penny she earned to her trafficker.  Every aspect of her life, from where she slept at night to whether she ate anything in a given day, was controlled by the architect of the scheme, Defendant Simone.

Ms. Branch's ordeal predates Ms. Campbell's by several years but bears all the same hallmarks – Defendant Simone forcing her into sex work in the form of stripping in cities across the country with savage beatings and threat of further force, all while he robbed her of her earnings.  She was forced to steal away a few dollars here and there so that she could eat because he would abandon her, both in Seattle or in another city, for weeks at a time without providing anything for her.  When she was home in Seattle, his physical violence was constant and unbearable.  In one instance, Defendant Simone put her in the hospital with two fractured ribs and a punctured lung.  He forcibly took over her apartment and forced her to rent it out on



AirBnB, keeping the proceeds for himself and then refusing to pay the rent.  She lived under

constant threat of not only physical abuse, but eviction and homelessness.

Ms. Mortenson, a college graduate, was duped into leaving a good job in Minnesota and

moving to Seattle by Defendant Simone on the promise of making art for his bogus "record

label."  She was immediately forced into stripping and moved to Las Vegas, a city that was

completely foreign to her, where she was forced to work in strip clubs 12 hours per day, every

day, until her body began to shut down from sheer exhaustion.  Defendant Simone maintained

total control over her life by utilizing other women to monitor her, periodically showing up in

Las Vegas unannounced, controlling her diet, taking all of her money – in excess of ten thousand

of dollars per week – and only leaving her enough for rent, and by raping and strangling her to

the point of unconsciousness whenever she displeased or questioned him.  So severe was her

condition that she was admitted to the hospital days when her kidneys began to fail from severe

dehydration.  When Ms. Mortenson tried to escape, Defendant Simone came to her apartment

after she changed her locks and snuck into the building by following a vehicle into the parking

garage after being turned away at the front desk.  He had to be removed by security and Ms.

Mortenson eventually obtained an order of protection against him.

Ms. Ali was introduced to Defendant Simone by Ms. Mortenson while Ms. Mortenson

was being trafficked by him.  Ms. Ali was in the midst of a period of depression when she

reached out to Ms. Mortenson seeking the comfort and company of a friend.  Ms. Mortenson

redirected her to Defendant Simone, as she had been conditioned to do.  Defendant Simone.

Like Ms. Mortenson, she was enticed by promises of a life together, a family, money, and

prosperity.  Her entire life changed overnight.  Ms. Ali was immediately forced into stripping,

first in Seattle and then in Las Vegas; her diet changed; she was completely cut off from her



family and friends.  Defendant Simone maintained control over every minute of her day.  Fear was all Ms. Ali felt for two and a half years amidst Defendant Simone's campaign of physical violence, strangulation, and rape.  In one instance, he waterboarded her while raping her as punishment for drinking alcohol.  Another time, he forced her to urinate on herself rather than letting her use the bathroom on a flight from Seattle to Las Vegas.  It was only after a complete emotional break, and the help of friends to keep her distance from Defendant Simone, that she broke free of his influence.

 Ms. Perez once enjoyed what she thought was a long and meaningful friendship with one of Defendant Simone's closest associates, Defendant Shaina Rae Essig (hereinafter "Defendant Essig").  Defendant Essig, who is also believed to have been trafficked by Defendant Simone from a young age (and who was, in fact, trafficked by another person who is now serving a lengthy prison sentence), began earning significant sums of money on the adult entertainment platform OnlyFans.  Ms. Perez, once a sex worker herself, sought to publish content on the platform and Defendant Essig promised to "promote" her through her "brand," known as "StillSirens."  In exchange, Ms. Perez turned over private and intimate content to Defendant Essig for publication through the "StillSirens" handle on OnlyFans.  However, as certain discovery has already revealed in this case, however, the "StillSirens" brand was not owned or operated by Defendant Essig – it was owned and operated by Defendant Simone.  Defendant Essig fabricated a story for purposes of gaining Ms. Perez's content and allowed Defendant Simone to publish it on his "StillSirens" handle and sell it, without a dime being returned to the rightful owner or creator of the content, Ms. Perez.  Ms. Perez is also a former romantic relation of another named defendant in this case, Rahmeece Howell, and filed a declaration in support of Ms. Campbell's prior effort to obtain a domestic violence protection order against Defendant



Simone.  When it became known that Ms. Perez had publicly supported Ms. Campbell's efforts to obtain a protection order against Defendant Simone, Defendant Essig, likely at the direction of Defendant Simone, began unlawfully sending "revenge porn" – unsolicited pornographic content – to both her and members of her family, including her son, through a variety of bogus usernames.

In all cases, Defendant Simone's abuse continued after Plaintiffs either escaped from him or took a stand against his abuse.  A prominent rapper in Seattle, Defendant Simone's lyrics blamed them for their own misfortune, and even made less-than-veiled threats.

This case is about seeking recompense for the incomprehensible suffering these young women endured from those who were responsible for it, and about giving a voice to a marginalized portion of the community that is often intimidated, coerced, or shamed into silence. Ms. Campbell escaped in late 2020 and, despite facing ongoing daily trauma, is ready to speak out.  Ms. Campbell faces direct physical intimidation by Defendant Simone and his surrogates who follow her to and monitor her at her home, work, and art functions because she dared to speak out.  Ms. Branch, despite having escaped years ago, has been struggling with the trauma for nearly six years.  She is just now, after extensive therapy and healing, ready to confront what happened to her.  Ms. Mortenson escaped in 2017 and has worked tirelessly to rebuild her life in a new state.  Despite moving thousands of miles away, she still looks over her shoulder everywhere she goes.

Miraculously, these brave Plaintiffs remain undeterred.

Plaintiffs are seeking not less than $1 million in compensatory damages each against the Defendants, jointly and severally, plus treble damages and reasonable investigative costs as authorized by the Washington Criminal Profiteering Act.  Enough is enough.



JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

# PARTIES

1.      Plaintiff Angelica Campbell is a resident of King County, Washington.

2.      Plaintiff Amanda Branch is a resident of Pierce County, Washington.

3.      Defendant Solomon "Raz" Simone (hereinafter "Simone") is a resident of King County, Washington.

4.      Defendant Jonathan Gant (hereinafter "Gant") is a resident of King County, Washington.

5.      Defendant Sara Belche (hereinafter "Belche") is a resident of King County, Washington.

6.      Defendant Shaina Rae Essig (hereinafter "Essig") is a resident of King County, Washington.

7.      Defendant Rahmeece Howell (hereinafter "Howell") is a resident of King County, Washington.

8.      Defendant Katie Fulford (hereinafter "Fulford") is a resident of King County, Washington.

9.      Defendant Black Umbrella, Inc. (hereinafter "Black Umbrella") is a Washington corporation with its principal place of business in King County.

10.     Defendant Simone is the legal alter-ego of Defendant Black Umbrella because Black Umbrella, its reputation, business model, and history, are based entirely upon Simone's contributions to the business.  One cannot not exist without the other.

11.     Defendant Commodity Properties, LLC (hereinafter "Commodity") is a Washington limited liability company with its principle place of business in King County.



Johannessen Law
PLLC

5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

12.     Defendant Simone is the legal alter-ego of Defendant Commodity Properties because Commodity Properties, its reputation, business model, and history, are based entirely upon Simone's contributions to the business.  One cannot not exist without the other.

13.     Defendant Talents Northwest, LLC (hereinafter "Talents") is a Washington limited liability company with its principal place of business in King County.

14.     Defendant Dustin Adams (hereinafter "Adams") is a resident of King County, Washington.

15.     Defendant Emily Schlackman (hereinafter "Schlackman") is a resident of King County, Washington.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction to hear the causes of action set forth below pursuant to RCW 2.08.010 because the amount in controversy exceeds $300.

17.     Venue is proper in King County pursuant to RCW 4.12.025 because the tortious scheme in question was conceived of and executed within King County.

## FACTUAL ALLEGATIONS

**The Trafficking Scheme.**

    <u>Methodology.</u>

18.     Defendant Simone runs a complex human sex trafficking scheme.

19.     This scheme involves targeting young, vulnerable women, often whom have recently undergone a significant personal tragedy such as homelessness (as with Ms. Campbell) or loss of a close family member (as with Ms. Branch).  These women come from both the greater King County area (as did Ms. Branch) and around the United States (as did Ms. Campbell



and Ms. Mortenson).  The victims are often already involved in sex work or are emotionally

pliable and therefore prone to it.  They are often artistically inclined.

20.     Defendant Simone, both directly and through agents, utilizes charm, praise, and

feigned interested in these women's hopes and dreams in order to cultivate romantic feelings

toward him.  This is a tactic known as "love bombing."  He then parlays those feelings into

physical intimacy, trust, and eventually, control.

21.     Once infatuated with him, Defendant Simone creates a situation of total

dependency upon him.  He offers them housing and a way out of whatever trouble they were

experiencing.  He takes control of their finances by monitoring their income, forces them to close

bank accounts, and demands they turn over whatever cash they earned to him.  He houses the

women in one of a number of properties he owned either directly or has acquired through straw

purchases in the names of some of the women he had victimized.  This method of creating

dependency is typical among traffickers.

22.     Once the women are dependent upon him, Defendant Simone forces them into

stripping, prostitution, and selling drugs.  He takes the money that each of the victims makes and

keeps it for himself.  He claims that the money is for the "Family," a euphemism for the network

of other women he traffics.

23.     Defendant Simone maintains control over the women with a variety of tactics that

amount to force, fraud, and coercion, the three hallmarks of trafficking.  He monitors their

electronic devices, social media accounts, and other communications.  He beats, strangles, and

rapes them when he becomes displeased with them.  He starves them by using food as a method

of control and not giving them enough money to feed themselves.  In some cases (such as Ms.



*Plaintiffs' Second Amended Complaint for Damages* - Page **9** of **84**

5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

Branch), he cuts their hair or shaves their heads completely as a sort of ritual branding. He takes all the money they earn, leaving them without any financial means to escape his control.

24.     On rare occasions, victims do break free. When they do, they are met with isolation, intimidation, continued monitoring, and threats. Defendant Simone continues to utilize his agents to watch and gather information on the women who escape his grasp. These women sleep with one eye open.

<u>The Participants in the Scheme.</u>

25.     Defendant Simone, known by his street name "Raz," is a local rapper and self-styled community leader. He is also a trafficker of women.[1] Defendant Simone is the owner of Defendant Black Umbrella and Defendant Commodity Properties. Defendant Simone gained public notoriety in the summer of 2020 as the leader of the Capitol Hill protests known as the "CHAZ" or the "CHOP." He was widely recorded on video engaging in physical altercations with other protestors and was frequently seen brandishing an array of firearms, including assault rifles, through the streets of Capitol Hill.

26.     Defendant Gant was, at all times relevant, a groomer within Defendant Simone's organization, and is also Simone's senior advisor, akin to the "consigliere" of the organization. Defendant Simone consults with Defendant Gant on all significant decisions involving his business, both legitimate and illicit.

27.     Defendant Belche was, at all times relevant, Defendant Simone's operations manager at Black Umbrella. Defendant Belche is the public face of Black Umbrella and works to legitimize its operations to the media and the public. She is also intimately involved with the

---

[1] In the common parlance, traffickers have been known as "pimps," and Defendant Simone represents himself as a "pimp" throughout his music. But the term is outmoded, as it portrays a sociable side to a very ugly thing. The parlance needs to change.

Johannessen Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

company's financial dealings.  Defendant Belche facilitated the unlawful conduct of Defendant Simone and Black Umbrella by providing logistical support and counsel for his activities.

28.     Defendant Essig is a long-time paramour of Defendant Simone.  Upon information and belief, Defendant Simone began trafficking Defendant Essig when she was still a teenager and just evading the grasp of another trafficker, who is now in prison.  Defendant Essig earns several hundred thousand dollars per year through her "OnlyFans" website, a paid pornographic website where users pay directly for sexually explicit content.  Defendant Essig funds the properties, vehicles, travel, and musical endeavors of Defendant Simone and Defendant Black Umbrella to the tune of at least $30,000 per month.  Defendant Essig also uses her Only Fans profile and other social media platforms to recruit woman for Defendant Simone's operation.  For a contemporary comparison, Defendant Essig is the Ghislaine Maxwell to Defendant Simone's Jeffrey Epstein.

29.     Defendant Howell goes by the street name "Fatal Luciano" and is an enforcer within Defendant Simone's organization, providing security for Defendant Simone's organization.

30.     Defendant Fulford runs Defendant Simone's drug distribution operation.  She manufactures cocaine and distributes it to the women within Defendant Simone's organization for sale at the street level, either while the women are working in strip clubs or prostituting.

31.     Defendant Black Umbrella is the corporate entity utilized by Defendant Simone to legitimize his operations.  He utilizes the business as a front for his music, which in turn, he uses as a premise for his travel around the country as a means of collecting other victims.



Johannessen Law
PLLC

5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

32.     Defendant Commodity is a shell business owned by Defendant Simone, which owns the office building located at 1770 Airport Way South, Seattle, Washington.  This is the property at which Defendant Simone periodically imprisons the women he traffics.

33.     Defendant Talents is an adult entertainment business that operates multiple clubs in Seattle, including one known as Pandora's.  Defendant Talents fosters a less than strict enforcement policy on customer etiquette – rather than making money from dances and stage performances, dancers are expected to earn their money by performing sex acts upon patrons.

34.     Defendant Adams is an advisor and enforcer within Defendant Simone's organization, who consistently informed Defendant Simone as to Ms. Campbell's whereabouts and activities, and continues to do so.  He also sells cocaine for Defendant Simone at the street level and assists in the production of content for Defendants Simone and Essig's OnlyFans platforms.

35.     Defendant Schlackman assists with Defendant Simone's drug distribution operation.  She distributes it to the women within Defendant Simone's organization and sells it at the street level, either while the women are working in strip clubs or prostituting.  She has also assisted Defendant Simone in sheltering assets by holding real property in her name on his behalf.

**Amanda Branch's Story.**

<u>Meeting Raz and dating.</u>

36.     Ms. Branch met Defendant Simone in the late summer of 2012 via Facebook.  He sent her an unsolicited link to some of his music, which she listened to, but did not otherwise respond.  At the time, Ms. Branch worked sporadically as a dancer in an adult entertainment club here in Seattle.



JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

37.     Several weeks later, Ms. Branch's father passed away unexpectedly.  Defendant Simone reached out to her and expressed his sympathies – to an extreme extent.  Despite not actually knowing her, Defendant Simone began asking probing, personal questions about her life and family and the communications were consistent for someone that Ms. Branch had never met before.  Being in an emotionally fragile state and taking it as a sign of interest from an attractive young man, Ms. Branch responded and engaged in the conversation.

38.     The two first met for a movie date in late September of 2012.  Ms. Branch introduced Defendant Simone to her good friend from childhood, Miles.  The two began seeing one another socially, going out on periodic dates and eventually having sex.  An exclusive dating relationship – or so Ms. Branch though – began in October of 2012.  Defendant Simone regularly told her he would make all of her dreams come true and that she would never want for anything again.  This is what is known as "grooming," the fraudulent and coercive methodology of a trafficker obtaining control of a victim.

<u>Manipulation, control, forced sex work, and violence.</u>

39.     One night after a movie date in late October, Defendant Simone and Ms. Branch returned to Ms. Branch's apartment.  The couple discussed their relationship, when Defendant Simone suddenly stated that the only way he could trust Ms. Branch was if she gave him all her money.  She had inherited a few thousand dollars as a result of her father passing away, which she had told Defendant Simone about.  Ms. Branch was speechless, but was still emotionally raw from the loss of her father and did not know how to say "no" to the man she had fallen in love with.  She agreed and gave him the money, never knowing that she would never see it again. This was a continuation of grooming which began to establish control over Ms. Branch.

Johannessen Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

40.     The following month, Ms. Branch and Defendant Simone traveled to New York just before the Thanksgiving holiday.  They stayed at a hotel called the Harlem Bed & Breakfast. Although Ms. Branch thought the couple were simply there for vacation, Defendant Simone instructed her to "go find a club to work in" – meaning a strip club – as soon as they arrived. She complied, as he instructed her that she needed to pay for the hotel.

41.     A few days later, while Defendant Simone was out with a music colleague, Ms. Branch was texting with Miles about plans to get together while Simone was busy with other things.  That evening, which was during the week of Thanksgiving, Ms. Branch left her phone in the bathroom.  When Defendant Simone found it, he saw the text messages.  He instructed his friend "Magik," who had accompanied the couple on the trip, to leave the room.  He confronted Ms. Branch about who she had been texting, and before she could answer, he began beating her.

42.     Defendant Simone savagely beat Ms. Branch about the head, face, and torso with closed fists.  He threw her into the bathtub and continued the assault.  He strangled her until she passed out, and when she came to a few moments later, he resumed beating her, all while berating her for cheating on him.  During the second beating, she managed to eek out the words "you've met Miles," referring to her friend that she had introduced him to the few days before. He stopped the beating and apologized to her.  Ms. Branch went to bed, sobbing.  Defendant Simone came into bed and attempted to initiate sex, which Ms. Branch refused by pretending to be asleep.

43.     The couple returned to Seattle several days after Thanksgiving, after which a new pattern of life emerged.



J O H A N N E S S E N  L a w
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

44.     Defendant Simone forced Ms. Branch to close her bank accounts.  Because she worked in a cash-based business and he forced her to give him all of her earnings, Defendant Simone told Ms. Branch she did not need a bank account.  She complied.

45.     As noted above, Ms. Branch worked as a dancer in the Seattle adult entertainment scene.  Specifically, she worked at a club called Dreamgirls.  Ms. Branch observed that Dreamgirls operated under a model whereby dancers were paid primarily not for stage dances, but to perform sex acts on patrons.  Over the course of her time there, she observed hundreds of sex acts, including oral sex and intercourse.  Dancers incentivized bouncers to keep prying eyes away by tipping them so they could perform these acts privately.  Management was well aware of this conduct, but took no action.  Dancers who did not perform sex acts were poorly compensated.

46.     Ms. Branch chose not to engage in sex acts while working at Dreamgirls.  This displeased Defendant Simone, who felt that she was not making enough money and was failing to meet her "quota."

47.     Quotas are the amounts that women are expected to earn for their traffickers in a given night.  If they fail, consequences are severe.

48.     Remembering that she had experienced success just dancing at the club in New York, Defendant Simone began sending Ms. Branch to multiple cities around the country to dance in strip clubs.  Over the course of the next three years, Defendant Simone ordered Ms. Branch to dance in New York, Las Vegas, and Portland.  Defendant Simone ordinarily called Ms. Branch with less than 2 hours' notice before her flight.

49.     Ms. Branch was required to deposit her cash earnings into Defendant Simone's account at a local U.S. Bank branch in whatever city she was in.  She had no money of her own



Johannessen Law
PLLC

5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

and was forced to steal away $20 here and there to feed herself.  Despite taking all of her earnings, Defendant Simone starved her.  Ms. Branch was required to dance every single night.  Defendant Simone would maroon her in each city for between one and three months at a time until he felt she had made sufficient money, then send her a return ticket home.  Each time, Defendant Simone told Ms. Branch it "wouldn't be a good idea" for her to come home until he gave her permission.  After receiving the beatings she had at the hands of Defendant Simone, Ms. Branch knew these offhand remarks were not just thinly veiled threats.  They were threats against her very life and they placed her in fear that, if she did return without his permission, she would be severely beaten.

50.    While she was home, Ms. Branch was subjected to constant physical abuse.  While she was only home for several weeks at a time, she only saw Defendant Simone sporadically when he came to collect money from her work in Seattle and have sex with her.  He slapped her every single time they had sex, leaving marks on her face and body.  He "branded" her with teeth marks.  About once every other month, he would strangle her to the point of unconsciousness, and then have sex with her afterwards as a method of "love bombing" to attempt to make up with her.

51.    In one particularly brutal incident, Ms. Branch had been given a plane ticket by a friend to Las Vegas for a birthday trip during a period that Defendant Simone was busy elsewhere.  On the last day of the trip, Defendant Simone contacted her and instructed her to stay in Las Vegas and strip.  She angrily refused and returned home.  That night, he came to her apartment while she was cooking a meal of pot stickers, threw the pan to the floor, and proceeded to beat and kick her so badly that she wound up with two fractured ribs and a punctured lung.  She was treated at Harborview Medical Center for her injuries.



J O H A N N E S S E N   L a w
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

52.     Ms. Branch was so brainwashed that she did not realize she was being raped and trafficked.  Defendant Simone's emotional manipulation (now commonly recognized as "gaslighting") was so effective that Ms. Branch began blaming herself for when he was angry with her, even having suicidal thoughts at times.  After each assault, Defendant Simone would "love bomb" Ms. Branch by smothering her with affection, promising never to hurt her again, and reassuring – and indeed convincing – her that they were a loving couple.  This is the cycle that results in what is known as trauma bonding, which is a psychological survival mechanism by which victims emotionally bond to their abusers upon recognition that their very lives depend upon remaining in the good graces of their abusers.

53.     In 2014, a friend of Ms. Branch's moved out of her apartment in the Capitol Hill neighborhood and relocated to Florida to have a baby.  She offered her apartment to Ms. Branch, who eagerly accepted.  Defendant Simone concocted a scheme whereby she would keep her lease on her existing apartment, located at the Lee Court Apartments on 5th Avenue, and turn it into an AirBnB.  The money from the AirBnB was funneled directly into Defendant Simone's bank account; Ms. Branch never saw a dime of that money.  In total, he took approximately $22,000 from her, just from the AirBnB.

54.     This violent trafficking cycle continued into late-2015.  In the summer of 2015, the couple had an argument over the telephone during which Ms. Branch was intoxicated and called Mr. Simone a "bitch."  He came to her apartment, pinned her down, and forcibly cut off her hair, which was nearly down to her waist at that point.  Ms. Branch's head was later shaved, as the inconsistent cutting Defendant Simone had performed could not be salvaged.  As a result, she was forced to stop dancing and no longer had a source of income for Defendant Simone.



Johannessen Law
PLLC

5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

55.     Ms. Branch soon took a job at a children's hair salon in the U Village shopping center.  Shortly after taking the job, Defendant Simone went away to Paris for several weeks.  During this absence, Ms. Branch was contacted by a friend who told her that she had met another woman, Defendant Schlackman, was also dating Defendant Simone.  Ms. Branch eventually spoke with Defendant Schlackman, and in fact, confirmed that Defendant Simone had given them both the same sexually transmitted infection.

56.     Upon becoming aware that Ms. Branch had spoken to Defendant Schlackman, Defendant Simone became irate.  Fearing for her safety, Ms. Branch ended the relationship.  Because Defendant Simone no longer saw any monetary benefit in Ms. Branch in that she could no longer strip, he did not pursue her.  He cast her aside like a spent resource.

        The Aftermath.

57.     After leaving Defendant Simone, Ms. Branch was a broken woman.  She was addicted to chaos and developed a host of extremely reckless and self-destructive behaviors.  She remained in denial for years due to Defendant Simone's extensive gaslighting, blaming herself for what happened and denying that she was a victim, and rationalizing that she had simply made an embarrassing mistake.  Defendant Simone continued to gaslight Ms. Branch after their breakup.  In his song entitled "Ex Callin," he blames her for what happened while simultaneously acknowledging that he shaved her head.  He threatens her when he asks if she forgot about the "M.O.B.," a common acronym among traffickers, which stands for "money over bitches."  The photograph cover of this song on Spotify, Pinterest, and other public platforms is an unauthorized image of Ms. Branch.



J O H A N N E S S E N   L a w
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

58.     In one instance, Ms. Branch entered into a new romantic relationship.  Several months into the relationship, she caught her significant other cheating on her with another woman.  She blacked out and destroyed a significant amount of his personal property.

59.     Ms. Branch's significant other sought, and was granted, a restraining order.  As a condition of the order, Ms. Branch was required to seek counseling.  Several months into counseling, she disclosed her years-long ordeal with Defendant Simone and was immediately diagnosed with post-traumatic stress disorder.  She was required to complete a course of counseling for a further two years as a condition of having the order expunged, which it now has been.

60.     Ms. Branch as also been diagnosed with depression and anxiety, and likely suffers from ADHD, although has not yet received a formal diagnosis of the latter.  These conditions have impeded her ability to return to school and seek higher education.

61.     She has also been alienated from the vast majority of her family.  She has suffered the embarrassment of her mother caring for her after she suffered injuries, including black eyes, at the hands of Defendant Simone.

62.     It was not until Ms. Branch met her current boyfriend in the December of 2019 that she finally realized that she had been the victim of a crime.  The gaslighting put in place by Defendant Simone finally began to lift, the deception was finally cleared, and she finally realized that the horrific ordeal that she suffered was not her fault.

63.     As is common for survivors of human trafficking, it took years for Ms. Branch to overcome the deception and gaslighting of her pimp to come to realize that she had been a victim of these horrific crimes.  <u>Six years</u> after her ordeal finally ended, she is just beginning to take steps toward regaining her sense of self.



JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

**Tessa Mortenson's Story.**

<u>Meeting Raz and the Shock of Immediate Trafficking.</u>

64.     Ms. Mortenson was a recent college graduate working at the Wesley Center for Spirituality, Service and Social Justice at Hamline University in St. Paul, Minnesota in January of 2016.  She was also an aspiring freelance graphic designer.

65.     In the fall of 2015, a friend of Ms. Mortenson played one of Defendant Simone's songs for her.  Because she was building a name for herself as a graphic artist, she sought out other artists for whom she could create graphic artwork and followed them on social media.  On January 18, 2016, after seeing on his social media that he was coming to Minneapolis, Ms. Mortenson reached out to Defendant Simone via email and offered to connect him to local artists in the Twin Cities area.  Defendant Simone promptly struck up a dialogue with Ms. Mortenson.

66.     During the visit, Defendant Simone asked why Ms. Mortenson was working an office job when she was so talented.  He said she should be creating art for his record label.  Defendant Simone made promises of making ten times what her current salary was at the time if she did graphic design for him.  After returning to Seattle, Defendant Simone began sending Ms. Mortenson lengthy messages daily asking about her life, admiring her work, and oddly, critiquing her diet.  He persisted in his insistence that she move to Seattle and work for him.

67.     Ms. Mortenson was eventually wooed by promises of financial sustainability living out one of her dreams as a graphic designer for a record label, and agreed to leave her job and relocate to Seattle to pursue her passion for art.

68.     Ms. Mortenson's office threw her a going away party on February 18, 2016.  Defendant Simone immediately booked Ms. Mortenson a ticket to Seattle with the understanding that she would be flying out temporarily to visit his recording facilities and that she would be



J o h a n n e s s e n   L a w
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

able to return home to pack up the rest of her apartment, but in fact, she was not permitted to return for four months.

69.     Defendant Simone purchased a plane ticket for Ms. Mortenson, but kept changing the time of the flight.  This is a common tactic – Defendant Simone routinely keeps time pressure on his victims to keep them off balance and under stress.  Ms. Mortenson eventually boarded a plane to Seattle at 6:30 am local time on February 23, 2016.  Defendant Simone picked her up from the airport and drove her to a small studio apartment in West Seattle.  During the drive, he took her driver's license from her.

70.     At the apartment, Defendant Simone directed her to the loft bed, where he produced a handgun from his waistband and laid it down next to her head on the bed while he had sex with her.  He also bit her chest above her right breast, leaving bruising.  When he finished, he told her to pick up his handgun and give it back to her.  Ms. Mortenson protested because she was afraid to handle a handgun, but he told her that she had to do it, so she complied.

71.     Within a day, Defendant Simone returned to the apartment in a hurried state.  He called Ms. Mortenson on the phone from his car and instructed that she had to pack all of her belongings immediately because he was taking her to another location, as he had "forgotten" that he had a flight out to Belize that day.  He told her to hurry up and not ask questions.  She was hurried into Defendant Simone's vehicle, a white Tesla, and was told to "don't say anything" to the other occupant of the vehicle – who Defendant Simone claimed was the violinist for nationally acclaimed recording artist "Macklemore," known by his given name as Benjamin Haggerty.



Johannessen Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

72.     It is unclear whether the other person in the vehicle was affiliated with Macklemore, or whether Defendant Simone's claim was mere puffery.

73.     Defendant Simone transported Ms. Mortenson across state lines to Portland, Oregon.  He took Ms. Mortenson to the Eastside Lodge, a motel in Portland.

74.     After checking into a room, Defendant Simone closed the door and informed Ms. Mortenson, very matter-of-factly, that she would be going to the strip club Union Jack's across the street later that night to audition as a dancer.

75.     Ms. Mortenson stood there in a state of silent shock.  The reality that she was in a foreign city, having been transported there from another foreign city where she had arrived just the very same morning, with almost nothing to her name, was beginning to sink in.  As soon as Ms. Mortenson began to say no and cry, Defendant Simone strangled her and told her to "grow up and figure it out" among a string of intimidating statements.  He then left to catch his flight to Belize.

76.     Ms. Mortenson cried herself to sleep in the hotel room and did not go to Union Jack's that night.

77.     The next day, on February 24, Ms. Mortenson began receiving a barrage of text messages through the international messaging app WhatsApp from Defendant Simone, who continued berating her that she had to go and audition at the Union Jack's strip club.  Ms. Mortenson went into the club as directed but was so frightened that she turned around again immediately and walked out.  With only a few hundred dollars to her name, Defendant Simone told her that he would not pay for any more nights in the motel and that she would have to find her own lodgings and pay for them herself until he returned.  Ms. Mortenson found a hostel



called The Society Hotel in downtown Portland that charged a modest rate for a bed in a
communal room and checked herself in.

78.     Later that evening, Defendant Simone instructed Ms. Mortenson to buy "dancer
shoes" at a nearby store.  So foreign was the concept of stripping to Ms. Mortenson that, when
she first tried on the shoes in the store, she lost her balance and fell over.

79.     On February 25, Defendant Simone continued pressuring Ms. Mortenson to
audition at strip clubs in Portland.  Having left her with no money and with the little cash she had
quickly vanishing, Ms. Mortenson was forced to eat once a day at the same restaurant, which she
could only afford because they had a "name your price" bowl.

80.     Eventually, on February 26, desperate to begin earning money, Ms. Mortenson
signed a rental stage agreement at Spyce Gentleman's Club in Portland.  Her first night working
at the club, Ms. Mortenson was so terrified and over stressed that she slipped on stage in a pool
of her own sweat.  Another dancer at the club noticed how apprehensive and out of place she
seemed and asked her why she was stripping.  When Ms. Mortenson told her that Defendant
Simone had brought her to Portland without any warning and ordered her to begin dancing, she
warned Ms. Mortenson that he had a reputation of being abusive.

81.     Shocked by what she had learned, Ms. Mortenson texted Defendant Simone via
WhatsApp and confronted him.  He called her immediately and, in a page directly out of a
trafficker's playbook, told her that she had disobeyed him, that she was allowing a stranger's lies
to cloud her judgment, and that this person was jealous of him.  He ordered her to return to the
club the next night and continue stripping.



Johannessen Law
PLLC

5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

82.     On March 1, having befriended one of the front desk staff at the hostel, Ms. Mortenson went on a day trip to the beach.  Defendant Simone found out that Ms. Mortenson had gone on the trip and instructed her that she was not to do anything without his permission.

83.     Ms. Mortenson continued at the club until Defendant Simone returned and picked her up on March 7, 2016.  He took all of the money she had made from her and drove her back to Seattle, Washington.  During the drive, he pulled over in a remote fielded area, got out of the car, opened Ms. Mortenson's door, and ordered her out of the car.  He pulled down her underwear, turned her around, and raped her.  That evening, he returned her to the same studio apartment he had taken her to when she first arrived two weeks before.

84.     Feeling trapped, Ms. Mortenson surreptitiously took several photos and short videos, in which she stated that she felt trapped in the apartment.

A Year and a Half in Las Vegas.

85.     On March 11, Defendant Simone matter-of-factly informed Ms. Mortenson that she needed to begin searching for places to stay in Las Vegas because she would be moving there to strip for him.  She was gripped with panic but felt that she had no choice but to comply. In the two short weeks she had known him already, he had strangled her, laid a gun next to her head during sex, stranded her in a foreign city, forced her to strip to survive, and raped her on the side of the road.  Ms. Mortenson agreed because she feared how much worse the abuse would get if she refused.

86.     Defendant Simone booked Ms. Mortenson a ticket on March 14, 2016 and informed her that day that she was leaving imminently.  She was given approximately one hour to pack and get to the airport.  She was so rushed that she missed her first flight and had to sit at



JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

the airport for seven hours until another flight became available in the early morning hours the following day.

87.     Ms. Mortenson arrived in Las Vegas, Nevada on March 15, 2016.  Defendant Simone picked her up several hours later and drove her to the Circus Circus hotel, where he strangled and raped her.

88.     Immediately afterwards, Defendant Simone drove Ms. Mortenson to the Clark County Sheriff's Department to get what is known as her "Sheriff's Card," which is the county-required stripping permit.  Defendant Simone watched her every move.  While waiting, Ms. Mortenson conversed with another young woman waiting to get her own Sheriff's Card.  After obtaining her Sheriff's Card, Ms. Mortenson left and returned to Defendant Simone, who was angry that she had spoken to someone.  He instructed her that she was not permitted to talk with anyone from that point on, nor was she permitted to make friends at the clubs she was to dance in.  He demonstrated precisely how to ignore someone so that she understood.  Defendant Simone dropped Ms. Mortenson at the Sapphire strip club and instructed her to audition, telling her that she could walk back to the hotel afterwards.  According to Google Maps, these two destinations are approximately a mile apart.  Ms. Mortenson did not have comfortable walking shoes.

89.     Ms. Mortenson took several Lyft rides to various strip clubs to audition the night of March 15.  Fear and apprehension overwhelmed her.  On March 16, she was accepted at a club called Cheetah's.

90.     On March 18, Ms. Mortenson realized she was unable to afford a hotel room any longer and she relocated from Circus Circus to an AirBnB on the outskirts of Las Vegas.



5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

91.    On March 27, after an incident in the neighborhood that made her feel unsafe, Ms. Mortenson expressed to the AirBnB host that she wished to break her appointment early.  After verbally confirming that this was agreeable, the host changed his story over text message.  Ms. Mortenson then recorded the host admitting that he had lied in the text messages and played the recording for Defendant Simone.  Defendant Simone then ordered Ms. Mortenson to make a copy of the house key and subsequently returned to the AirBnB to confront the host.  He opened the trunk of his vehicle and knocked on the door.  When the host answered, Defendant Simone began strangling him, lifting him off the ground in the process.  When another occupant came to defend the host with a knife, Defendant Simone released the host, returned to his car, and sped off.

92.    After being forced and pressured to have a successful audition at a strip club in Las Vegas, the only club to accept Ms. Mortenson was Cheetahs, due to her bigger body shape. She had to work every night at Cheetahs in order to make enough money to secure rental housing.  Ms. Mortenson was only able to secure a small month-to-month apartment on Royal Crest Street near the Las Vegas Strip.  It was a first-floor apartment with barred windows.  In the first week of April, Ms. Mortenson received an opportunity to meet with a potential client for graphic design who is a globally recognized artist.  As was his policy, she had to ask Defendant Simone's permission prior to going.  Ms. Mortenson called him to ask permission, and surprisingly, Defendant Simone allowed her to attend the meeting.  He told her to be home by midnight, and also stated that she was not to consume alcohol, which was his policy for all his victims.  He led Ms. Mortenson to believe he was in Seattle during the call.  Ms. Mortenson attended the meeting and did consume alcohol, eventually falling asleep on a couch.  When she returned home the following morning, she found Defendant Simone standing outside the



apartment door.  He instructed her to immediately unlock the door at which point he led her to the bedroom and raped her for disobeying him.

93.      Defendant Simone forced Ms. Mortenson to work every single day.  She worked 12 hours per day for over a year with rare exceptions.  Between being unable to eat regularly, Defendant Simone controlling her diet, and living in a constant state of anxiety, she lost 40 pounds.  Defendant Simone forced Ms. Mortenson to work the night shift at the strip clubs, which was typically from 7pm to 7am the following day.  Ms. Mortenson was expected to earn in excess of $1,000 per night as her "quota," and if she did not meet that, Defendant Simone forced her to stay at the club until noon.  At the end of every shift, she was forced to turn over her cash earnings to either Defendant Simone (when he was in town personally) or another of his victims, Allison Seitz-Butte, who deposited the money into a Bank of America account belonging to Defendant Simone.  Defendant Simone only gave Ms. Mortenson exactly the amount of money she needed for rent, utilities that did not account for hot water, bare minimum of outfits needed for work, and groceries for the limited diet he permitted her to eat.  She lived in constant fear of retaliation for disobeying him, even afraid to purchase the wrong food, she would have to text another one of his victim's for advice on what food to purchase.

94.      Defendant Simone maintained control of Ms. Mortenson through a campaign of violence and coercion.  During the times that she was forced to stay late at the clubs, Ms. Mortenson sat in the entertainment lobby, shivering due to lack of customers and the bare attire she had to wear, exhausted after already working 12 straight hours in six inch heels.  She lived in a state of constant unease and agitation about when he would show up to her door, as he never informed her before traveling to Las Vegas.  He had a key to her apartment, and she would frequently come home from a 12-hour shift of dancing and find him waiting for her in her bed.



Johannessen Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

She never knew when he was going to show up and lived in a state of constant anxiety about his whereabouts.  He raped her every time he visited and strangled her any time she disobeyed him. On June 22, 2016, she offered to make a run to the bank to deposit her earnings toward rent – which he claimed – into the bank, and he responded "[s]o now you tell me things without asking?"  When Ms. Mortenson attempted to explain herself and apologize, Defendant Simone instructed that she was to "ask if that was okay.  You don't tell me what you're doing with my money."  In October of 2016, while Ms. Mortenson was experiencing a physical and emotional breakdown, she sent texts apologizing to Defendant Simone for her "mistakes" – things that she believed would displease him – and he responded simply by saying "[s]top being weak." Defendant Simone showed Ms. Mortenson and Ms. Seitz-Butte the music video for "Ex Callin," which included the image of Ms. Branch's shaved head, and warned them that "this is what happens" to women who disobeyed him – that he shaved their heads as punishment, rendering them unable to strip and earn money.

95.     Ms. Mortenson nearly worked herself to death under the control of Defendant Simone.  By April 28th, 2016, Ms. Mortenson had been admitted to the hospital, after obtaining permission from Defendant Simone, and was diagnosed with a form of kidney damage brought on by severe dehydration.  Ms. Mortenson was forced to work so often that she literally did not have enough time to drink water.  After missing one day of work for being admitted to the hospital, Defendant Simone began instructing her to return to work, telling her she needed to be "stronger."  She continued to work under duress and extraordinary physical pain.  On May 18th and August 10th of 2016 Ms. Mortenson had sought medical attention for the pain along the area of her right kidney.  On August 23, 2016, Ms. Mortenson underwent a ureteroscopy stent placement with a following surgery on August 30th to laser remove stones within two more



weeks.  After surgery, Ms. Mortenson continued to feel abdominal pain with more recorded

visits to various health centers throughout the year of 2017.  Despite her serious health concerns,

Defendant Simone continued to force Ms. Mortenson to work every day, 12 hours minimum a

day doing multiple forms of sex work, even working at the strip club on Christmas.  Defendant

Simone forced Ms. Mortenson to have sex with him while she had the stent inside of her, which

was extremely painful.  Defendant Simone called and texted Ms. Mortenson multiple times a

day, every day.  She was required to check in with him at the beginning of every shift and tell

him exactly how much she had made at the end of every shift.

96.     Ms. Mortenson moved to the Newport Lofts Apartments in June of 2016.

97.     In late August or early September of 2016, Defendant Fulford traveled to Las

Vegas with Defendant Simone.  At a dinner with Defendant Simone and Defendant Fulford,

Defendant Fulford revealed that she "worked" for Defendant Simone by driving for Lyft.  Later

that evening in her apartment, Ms. Mortenson complained privately to Defendant Simone asking

why she had to strip while Ms. Fulford got to drive for Lyft.  Defendant Simone told Ms.

Mortenson to stand up and follow him.  He took her to a stairwell and looked around for cameras

and witnesses.  Finding none, he strangled Ms. Mortenson and lifted her off the ground.  He

berated her for asking questions and told her that she had no place asking about other women.

He stated that Defendant Fulford would "bury a body if I told her to."

98.     In the November of 2016 Defendant Simone took Ms. Mortenson to participate in

the protests against the Dakota Access Pipeline at Standing Rock, North Dakota.  Prior to the

trip, Defendant Simone held several concerts that he held out as being for charity to support the

protesters and members of the Sioux Nation who were supporting the protest.  Defendant Simone

collected significant amounts of clothing and blankets, which he told his audiences he would



J O H A N N E S S E N   L a w
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

donate.  Defendant Simone rented a large van and transported Ms. Mortenson to the protest; however, during their time there, he did not donate one single item he had collected, and only remained at the site long enough to collect photo ops.  Prior to the stay at Standing Rock, Defendant Simone had issued instructions to Ms. Mortenson, Ms. Seitz-Butte, and Defendant Fulford that they were only permitted to take cold showers.  Ms. Mortenson contracted a cold at Standing Rock and asked Defendant Simone if she could take a hot shower because she was sick and he said yes.  However, when she did so the following day, he ordered her back into the bathroom and felt the pipes.  When he felt heat, he strangled Ms. Mortenson until she lost consciousness for apparently disobeying him, despite having given her permission the day before.  Defendant Simone returned to Seattle with the items he had claimed to be donating and kept them for himself.

99.     At the end of March 2017, Ms. Mortenson began expressing depression and suicidal ideation to Defendant Simone as a cry for help.  In response, Defendant Simone flew Ms. Mortenson to Seattle from Las Vegas and punished her by forcing her to stay in a sleeping pod located at his "Headquarters," an office building on Airport Way, for three consecutive days. While imprisoned at the pods, Defendant Simone berated Ms. Mortenson for complaining about her life and threatened that, if she did not like stripping, he would put her "on the track," which is slang for prostituting, in Los Angeles.  On the third day of this punishment, Defendant Simone instructed Ms. Mortenson to enter a vehicle with him and one of his associates.  She did not know where they were going.  Defendant Simone drove her across state lines to Utah to a gun license certification course and forced her to apply for a gun permit.  She was then driven back to Seattle and flown to California, where she worked for a private individual one week, before



Johannessen Law
PLLC

5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

being forced to turn over the money from that trip to Defendant Simone and again returning to Las Vegas.

100.    After another a few months, Ms. Mortenson broke down physically and emotionally.  In early June of 2017, she decided she was no longer afraid to die and had had enough of Defendant Simone's abuse.  In an emotionally charged phone call, she told him how she felt, she told him that she was no longer willing to accept what he put her through, and she told her she would not continue this way of life.  She detailed the abuses that she had learned of him perpetrating upon other victims, including waterboarding one woman while raping her.  This struck her particularly hard, as the woman in question had been a friend of hers that she introduced to Defendant Simone, and she felt extreme guilt for having put her in that position.  Defendant Simone responded by attempting to threaten and gaslight her into compliance.  Ms. Mortenson would not hear it, and in the heat of the moment, threw her phone and broke it.

101.    The breaking of her phone was a watershed moment: Ms. Mortenson was given a short reprieve from the barrage of abusive communication from Defendant Simone.  It was the first time in a year and a half that she did not have to face persistent telephone calls and text messages from him, which triggered a realization that she had a window of time to act.  In that short time, Ms. Mortenson took it upon herself to research sex trafficking and realized that she was a victim.  She identified some of Defendant Simone's control tactics immediately, recognized in herself the signs of Stockholm Syndrome and, in a moment of clarity, resolved to terminate the relationship permanently.

102.    On June 12, 2017 Ms. Mortenson contacted the management of her apartment building and changed the locks on her front door, as well as notified the front desk staff that Defendant Simone was not welcome to visit her.  At 11:02 am, she sent a very gently worded



JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

email to Defendant Simone terminating the relationship for fear that any provocation would result in physical violence.  She premised the break-up on a need to focus on her physical health because she was terrified to tell him that she had come to realize that she was a victim of sex trafficking.

103.    At the time she sent her email, Ms. Mortenson did not know where Defendant Simone was.  However, that evening, he attempted to gain entry to her apartment.  First, he went to the front desk and was refused permission to go up.  After being turned away, he snuck into the secure building through the parking garage behind an entering vehicle.  The parking garage was secured by a gate and a security door, so Defendant Simone waited for a tenant's vehicle to swipe in and ran in behind it.  This conduct was captured on security video.  Once inside the building, Defendant Simone entered the elevator and went up to Ms. Mortenson's apartment.  When he discovered his key no longer worked, he began banging on the door and shouting for Ms. Mortenson to let him in.  She feared for her life and summoned building security.

104.    Defendant Simone was escorted out of the building and later sent Ms. Mortenson an angry responsive email and Twitter messages laced with veiled threats.  Ms. Mortenson took caution in her tone responding and attempted to de-escalate him, eventually breaking off contact completely.  Defendant Simone continued to rage at her on social media.

105.    After breaking free, Ms. Mortenson came into contact with three other women who had escaped Defendant Simone's control.  All of them reported that they had endured the same forced sex work, rape, strangulation, and other torture that he had inflicted upon Ms. Mortenson.  One woman reported that Defendant Simone had put her in a body bag and driven her around in the trunk of his car for hours before raping her.



J o h a n n e s s e n   L a w
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

106.    After hearing these stories and realizing that Defendant Simone was not only a danger to her, but to other women, Ms. Mortenson sought a protection order in Clark County District Court on July 28, 2017.  After presenting extensive evidence of Defendant Simone's abuse, control tactics, and his break-in at her apartment at a hearing, the District Court made findings that he had committed domestic violence against Ms. Mortenson and entered an extended protection order.

<u>The Aftermath</u>.

107.    Ms. Mortenson was forced to move to a new apartment for several months to ensure that Defendant Simone did not know her whereabouts.  Shortly after being served with the protection order, Defendant Simone released a song called "MOB MOB MOB," in which he made direct threats against Ms. Mortenson and another trafficking survivor in a spoken word statement at the end of the song, stating: "[t]wo white women trying to go against one black man. Fuck outta here.  Even though you're trying to put me under, I'm still saving your fucking life.  I got random people I don't even know calling my phone from the streets talking about they 'saw the paperwork' and they want to knock you off and I'm sitting here trying not to knock you off. Fuck out of here."

108.    Ms. Mortenson faced a barrage of social media harassment, including from Defendant Simone and Defendant Essig.  At the return hearing for her protection order petition, the judge ordered Defendant Simone to take down the wildly offensive social media posts, one in particular in which he admits bailing her out of jail following a prostitution arrest.  Defendant Essig berated and harassed Defendant Mortenson, accusing her of being "delusional" and a "fucking sick liar."  Defendant Essig appeared shocked to learn that Defendant Simone had never told Ms. Mortenson, or any of the other women he trafficked in Las Vegas, about her.



J o h a n n e s s e n   L a w
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

109.    Additionally, in retaliation, Defendant Simone forced another one of his victims, Ms. Seitz-Butte, to file a bogus protection order petition on August 1st of 2017 Ms. Mortenson and another survivor who had escaped based upon text messages that the two had sent to Ms. Seitz-Butte urging her to escape from Defendant Simone.  That petition was promptly dismissed.

110.    In August of 2017, Defendant Simone released a song called "When I Style on My Enemies," in which he directly alludes to Ms. Mortenson, insulting her body, acknowledging that he moved her from "over there" (a reference to her home in Minneapolis), and blaming her for convincing other women to escape his grasp.  A portion of the music video, released a year later, is filmed in Las Vegas, where he trafficked Ms. Mortenson.  Defendants Fulford and Schlackman also appear in the video.

111.    Ms. Mortenson has struggled with depression, anxiety, and the physical repercussions (including further medical visits and surgeries) of her ordeal for the past four years, even after moving back to Minnesota.  Two of her toes are permanently disfigured because Defendant Simone would not allow her to buy proper fitting shoes for dancing.  She was also overwhelmed with the shame and humiliation of having effectively disappeared from her family overnight and having to explain her ordeal.  She suffers from PTSD and has borned significant shame and financial hardship, which until this year, led her to believe that her only value was as a stripper.  It was not until January of 2021 that Ms. Mortenson was able to pull herself out of that deep depression and obtain her first job that was not stripping in four years.  She has started rebuilding her life with a new career, but still fears the possibility of Defendant Simone someday showing up and harming her.

112.    In total, Ms. Mortenson estimates that she would have earned more than three quarters of a million dollars during her time in Las Vegas.  Defendant Simone took all of it.



JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

**Nabila Haji-Ali's Story.**

<u>A Vacation Becomes Permanent.</u>

113.     Ms. Ali was a student at St. Cloud Community College pursuing a nursing degree in February of 2017.  She was also working a job she did not particularly care for and was in a professional and emotional slump bordering on depression.  She had turned 21 just the month before.

114.     On February 8, 2017 Ms. Ali decided to call an old friend, Ms. Mortenson, whom she knew to be living in Las Vegas at the time.  Ms. Mortenson reported that she was happy and earning significant amounts of money.

115.     Ms. Ali expressed a desire to visit, but Ms. Mortenson said she would have to get permission from Defendant Simone.  Ms. Ali thought this was odd, but did not think to question it at the time.  Shortly thereafter, Defendant Simone called Ms. Ali and spoke with her at length about her aspirations and asked how quickly he could fly her out.  Defendant Simone purchased her a ticket for the following day.

116.     On February 9, 2017 Ms. Ali boarded a flight from Minneapolis/St. Paul International Airport for Las Vegas.  When she arrived, she was greeted by Defendant Simone.  Ms. Mortenson was present, but waited, demure, for Defendant Simone to take the lead on introducing himself.  Defendant Simone hugged Ms. Ali and drove the three of them to one of his AirBnB properties where Ms. Seitz-Butte was also present.  Ms. Seitz-Butte was busy cleaning the property for the next guest.  There was little conversation, other than about how the women worked at the strip clubs and that Defendant Simone "protected" them.

117.     Ms. Ali, Ms. Mortenson, Ms. Seitz-Butte and Defendant Simone dined at a local restaurant that evening.  After dinner, Ms. Ali stated that she wanted Ms. Mortenson to



J O H A N N E S S E N   L a w
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

accompany her out to a hookah bar.  Ms. Mortenson laughed and said that they did not "do that stuff."  When Ms. Ali asked what "stuff" she was referring to, Ms. Mortenson recited a carefully scripted and memorized list – hookah, alcohol, red meat, dairy, processed sugar, or drugs of any kind.

118.    Ms. Ali was shocked at the sudden change in behavior exhibited in Ms. Mortenson.  This was not the same person she knew from years earlier in Minnesota.

119.    Despite having flown in from out of town to see Ms. Mortenson, Defendant Simone forced her to work in the strip club that night and did not allow her to spend time with Ms. Ali.  Defendant Simone dropped Ms. Mortenson at the Spearmint Rhino adult entertainment club and Ms. Ali was left alone with him.

120.    Defendant Simone drove Ms. Ali around the city for a short time before returning her to Ms. Mortenson's apartment.  There, he began his customary manipulation methodology.  He asked about her hopes and dreams, her plans, her goals,  Ms. Ali shared her goals of becoming a business owner, building a home, a life of prosperity, and eventually, a family.  Defendant Simone asked if she thought she could do it on her own, and proceeded to tell her "all my girls need help in some way.  We are a team, everyone plays their part."  Ms. Ali said she was happy that her friend, Ms. Mortenson, had found a "family" and Defendant Simone asked her to join the "family."

121.    As the two continued to talk, Defendant Simone promised Ms. Ali millions of dollars, worldwide travel, and the prosperity and family she longed for.  Eventually, he removed his shirt and asked her to rub him down with oil.  Ms. Ali was hesitant to pursue a sexual relationship in light of what she thought was Defendant Simone's relationship with Ms. Mortenson, but he convinced her that Ms. Mortenson would want it to happen because she

J O H A N N E S S E N  L a w
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

wanted Ms. Ali to be part of the "family."  The two eventually had sex, during which he asked her if she would give herself to him completely.  She said yes.  Afterwards, Defendant Simone explained the "family" creed: "loyalty, respect, and your word."

Induced to Stay.

122.    Ms. Ali remained in Las Vegas for several more days.  Defendant Simone left Las Vegas on February 11.

123.    On February 13, Ms. Seitz-Butte took Ms. Ali to attempt to get her sheriff card.  Because she was under 25 at the time, she was required to present her birth certificate, which was back in Minnesota.  Defendant Simone instructed her to return home to Minnesota to collect her necessary documents. He bought her a ticket a few days later.

124.    Ms. Ali returned home on February 16 to collect her documents.  She was terrified – she was being forced to tell her Somali family, which is both culturally and religiously conservative, that she had up and left home to go live with a man she had just met in Las Vegas.  Everything about it felt wrong, but she was compelled to do so.  She told every lie she could to try to reassure her family that everything was fine and that she was going to work for a Seattle real estate broker.

125.    Her documents in hand, she returned to Las Vegas a total of 17 hours later on February 17, 2017.  As she stepped off of her flight in Las Vegas, she messaged Defendant Simone to let him know that she had arrived.  Defendant Simone responded that he wanted her to come to another terminal.  Ms. Ali thought that he had just arrived in town and wanted to walk with her to their car, and was shocked when he said "what, do you want to miss your flight?  Run!"  Ms. Ali ran to the terminal on the opposite side of the airport.  Ms. Ali was upset that she



JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

had been forced to run, but Defendant Simone flatly stated that she was always expected to run. Ms. Ali, surprised that she had a ticket, boarded a flight with Defendant Simone to Seattle.

126.    Upon arrival in Seattle on February 17, Ms. Ali and Defendant Simone were picked up by Defendant Fulford.  The following day, Defendant Simone took Ms. Ali to the King County administration building to apply for her entertainer's license so she could work in strip clubs.  Defendant Simone and Ms. Ali purchased dancing clothing over the next three days. Ms. Ali remarked that she had very little regular clothing, but Defendant Simone pretended not to notice.

127.    Defendant Fulford was responsible for "training" Ms. Ali as to Defendant Simone's rules.  Defendant Fulford recited the same rules Ms. Mortenson had recited just days before at dinner: no hookah, no alcohol, no red meat, no dairy, no processed sugar, and no drugs. She added several additional rules: no spending money without Defendant Simone's permission, no going out or going anywhere without Defendant Simone's permission, and check in with Defendant Simone as to her whereabouts, coming and going, at all times.

128.    Ms. Ali was first forced to strip at Dream Girls at Rick's, an adult entertainment club in North Seattle, on February 22, 2017.  At the end of her shift, Defendant Simone picked her up and asked how much she made.  She said she had earned $300, and Defendant Simone said "let me see."  He held out his hand and took her money without another word.

129.    On February 23, Ms. Ali engaged in a discussion with Defendant Fulford about her aspirations to become a mother and revealed that she was not on birth control.  Defendant Fulford was visibly upset by this, as she felt it posed a threat to her position within the "family" that Ms. Ali could potentially become pregnant.  Defendant Fulford reported this to Defendant Simone.  Later that afternoon, Defendant Simone informed her that he she would have to abort



any pregnancies because a baby would "slow the family down" and that it would be selfish of her to hold everyone else back.  He recommended she get on birth control.  He also discussed other topics that Ms. Ali had discussed with Defendant Fulford, such as how she felt it was arrogant that Defendant Fulford referred to him as a "god."  Defendant Simone clarified this by telling Ms. Ali not to treat him as a god, but as a king.

130.    On February 24, 2017, Defendant Fulford took Ms. Ali to Planned Parenthood to receive an arm implant birth control device.  Ms. Ali struggled with this, as both abortion and contraception are violative of her Islamic faith.  But, because she felt in that moment that it was necessary to appease Defendant Simone, she agreed.  Defendant Fulford laughed at Ms. Ali and recorded Ms. Ali as the device was being implanted.

131.    On March 8, 2017, Defendant Fulford and Defendant Simone forced her to get a passport photo taken without her Hijab.  She was furious about this, as she had always appeared in government photos wearing the traditional head covering of her faith.  In an effort to continue solidifying control over Ms. Ali, Defendant Simone sought to "appease" her by forcing her into a four-way sex act with himself, Defendant Fulford, and Ms. Seitz-Butte, who had recently arrived from Las Vegas.

132.    On March 11, Defendant Simone instructed Ms. Ali that she would be returning to Las Vegas, along with Defendant Fulford.  Ms. Ali was told to sit in the window seat and Defendant Simone occupied the middle seat.  After takeoff, Ms. Ali told Defendant Simone she needed to use the restroom and asked him to get up, and he said no.  Five minutes later, she asked again, and Defendant Simone again told her she could not use the restroom.  She pleaded with him and said that she could not hold it anymore.  Defendant Simone responded that, if she trusted him, she would do what he said and just hold it.  He proceeded to eat a meal that



Johannessen Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

Defendant Fulford had prepared for him.  As he finished, Ms. Ali urinated on herself, unable to hold it any longer.

133.    Defendant Simone and Defendant Fulford laughed at her.  Only then did he get up and allow her to pass.  She stuffed paper towels into her wet pants in an effort to mitigate what had happened, but she spent the remainder of the flight cold, wet, and paralyzed with embarrassment.

134.    Upon arrival to one of his properties in Las Vegas, Ms. Mortenson greeted the group.  Ms. Ali ran up to hug her and went to sit on the couch to talk.  Defendant Simone snapped at her, asking "what do you think you're doing?"  He instructed her to follow her to the bathroom and berated her for sitting on a couch with urine-soaked pants.  He was standing less than an inch from her face.  He told her to stop acting like a child, to shower and change her clothes, and then to return to the group and make herself useful.

135.    On March 12, Ms. Ali first heard Defendant Simone threaten Ms. Seitz-Butte.  Ms. Seitz-Butte went by the name "Crea," a name her parents called her when she was young.  Ms. Seitz-Butte had introduced herself to one of Defendant Simone's associates as Crea and he took exception to that.  Ms. Seitz-Butte asked why she could not use the name her parents had given her and he told her she was giving him attitude and that he would change it for her if she continued being disrespectful.  He then took her into a bathroom for a significant amount of time.  She later emerged crying.

136.    On March 13, Ms. Ali was again sent home to Minnesota to collect a bag worth of clothing and personal items.  She returned to Las Vegas on March 15 and obtained her sheriff card.



5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

137.    On March 17, Ms. Ali had her first shift being forced to dance at Spearmint Rhino.  One of the patrons wanted to take her back to his hotel to hang out at a pool.  Ms. Ali was nervous, but there were apparently no sexual favors expected; however, she quickly learned otherwise and had to flee from the hotel when the man attempted to force sexual interactions. When she reported this to Defendant Simone and expressed concern about it, he simply stated that she would have to learn how to navigate those situations from Ms. Mortenson and Ms. Seitz-Butte, and to always text him her location so that he could "protect" her.  Ms. Ali told Defendant Simone she would not perform sexual acts, but he instructed to do whatever Ms. Mortenson and Ms. Seitz-Butte were doing.  She complied – Defendant Simone knew these women would do anything he told them to do.

138.    Similar to Ms. Motenson, Ms. Ali began working 12-15 hours per day, every day. She had to text Defendant Simone when she left home, arrived at work, how much she made, when she left, work, and when she arrived home again.  He periodically came into town, had sex with her, took her money, and left again.  Ms. Ali quickly be game so depressed from the routine that she periodically broke the drinking rule, and so exhausted that she periodically used cocaine.

139.    On [DATE IN LATE MARCH], Ms. Ali returned home at 4 am to find Defendant Simone asleep in bed with Ms. Seitz-Butte.  She had used alcohol and cocaine that night. Knowing she had violated Defendant Simone's rules, Ms. Ali felt a rush of panic and immediately went to the bathroom to clean herself up.  She slipped into bed and fell asleep before being awoken moments later by Defendant Simone, who had gotten up and was standing over her.  He ordered her into the bathroom and closed the door.  He told her that he had "people everywhere," and that he was going to give her a "chance to tell [him] whatever [she] need[ed] to tell [him]" before he said anything.  He repeated the family creed, "loyalty, respect, word" and



looked at Ms. Ali with a cold stare.  Ms. Ali admitted that she had consumed alcohol, to which

Defendant Simone responded, "I don't think you are done so keep going."  She then admitted

that she had used cocaine, and Defendant Simone asked if that was all.  Ms. Ali said yes and

Defendant Simone accused her of having sex with her customers at the strip club, which she

denied.

140.    Defendant Simone stood up as if to leave, and Ms. Ali followed suit.  Defendant

Simone then turned suddenly and grabbed her by the throat, slamming her up against the

bathroom wall.  He said only three words – "lying to me?!"  Defendant Simone strangled Ms. Ali

to the point of unconsciousness, releasing his grip for a moment to allow her one breath, only to

resume strangling her.  As she fell unconscious, she saw a vision of her mother and thought she

was going to die.

141.    Ms. Ali regained consciousness several moments later.  She was coughing and

gaging.  She had urinated on herself.  She was disoriented.  The shower was running and

Defendant Simone was sitting on the toilet.  She moved toward the shower, only to be seized

again by Defendant Simone.  He turned on the bathroom sink and forced her face under the

running water, while also forcing intercourse.  The force of Defendant Simone pushing himself

inside her slammed her head against the bathroom mirror.

142.    Defendant Simone waterboarded Ms. Ali in a bathroom sink while raping her, all

because she broke his rules.

143.    Afterwards, Defendant Simone flatly told Ms. Ali to "clean up the piss" and he

left.  Ms. Ali cried hysterically in the bathtub for several hours before being able to collect

herself.  She eventually did so, and obeyed – she cleaned the bathroom, then went to sleep.



JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

144.    Ms. Ali awoke several hours later and Defendant Simone returned.  He instructed her to go to the local pharmacy and obtain multiple STI tests.  Ms. Ali insisted that she had not had any sexual interaction with her customers, but he forced her to do it anyway.  He then forced her to take each test in his presence, allowing her no privacy whatsoever.  The two then sat on the couch and Defendant Simone explained that his rules were strict for a reason and that if she followed them, she would never have to endure what happened to her in the bathroom again.

145.    The following week, Defendant Simone booked Ms. Ali a flight to Seattle to visit him.  He took her to the Airport Way property, where she was to stay in the sleeping pods.  Upon arrival, Defendant Simone had intercourse with Ms. Ali.  Prior to the trip, Defendant Simone had instructed Ms. Ali not to tell Ms. Seitz-Butte where she was going.  Nevertheless, Ms. Seitz-Butte found out and confronted Ms. Ali.  When confronted, Ms. Ali acknowledged where she was to Ms. Seitz-Butte.  This acknowledgement made its way back to Defendant Simone.  After they had been intimate, Defendant Simone left the sleeping pods briefly, only to return and ask if Ms. Ali had texted Ms. Seitz-Butte.  She said yes, at which point Defendant Simone jumped on top of her and strangled her.  As he strangled her, he berated her, saying things like "shut your big ass mouth, bitch," "learn to follow directions," and "I try and spend some time with you and you fucking ruin it."

146.    When he finished, Defendant Simone locked Ms. Ali in a pod and did not let her leave for nearly a full day.  He did not even let her use the bathroom.  When he returned to collect her the following day, he asked "who do you belong to?"  Ms. Ali gave the conditioned response.

147.    Ms. Ali returned to Las Vegas, and the routine continued.  She worked constantly and kept nothing.  She was forced to work until she had earned at least $1,000 every single day.



JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

The pattern of Defendant Simone showing up, committing some form of horrific abuse, forcing sex, taking her money, and leaving became routine.

148.     In one instance in April of 2017, he showed up and demanded to know if Ms. Ali had seen $15,000 in cash in the house.  When she said she had not, he forced her into a bathroom and locked the door while he searched the house for the money.  He eventually found it, after having locked Ms. Ali in the bathroom for nearly an hour.  After this incident, Defendant Simone separated Ms. Ali from Ms. Seitz-Butte and moved her into one of his AirBnB units.  In May, Ms. Ali again consumed alcohol while visiting with a friend whom she had secured permission from Defendant Simone to visit.  However, she long overstayed the amount of time she was permitted to be out and had not checked in with Defendant Simone.  Ms. Ali's friend, sensing her fear and anxiety, offered to help her get home to Minnesota.  As Defendant Simone began raining down a barrage of calls and text messages, Ms. Ali agreed and went home to collect her things.  Once home, she did answer the phone so that she could honestly answer Defendant Simone when he asked where she was.  He told her "when I call, you better answer."  In the background, Ms. Ali could hear the distinctive sound of airport announcements over a loudspeaker, and she knew that Defendant Simone was at the airport on his way to Las Vegas.  She proceeded to the airport herself to find a flight to Minnesota, but found herself unable to go through with it.  A concerned airline worker, recognizing the signs of a trafficking victim, essentially forced her onto a flight.  She returned just a few days later.

149.     When she returned to Las Vegas, Ms. Ali began secreting away $100 per night and making a plan to leave.  On June 4, she blocked Defendant Simone's phone number and fled to a local motel.  On June 22, she learned that Ms. Mortenson had also left him.  The two exchanged stories of the horrible things he had done to them, and others.



J O H A N N E S S E N  L a w
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

150.     Ms. Ali was free of Defendant Simone for a month and a half.  But on August 14, 2017, while visiting a friend in California, Ms. Ali ran into trouble and called Defendant Simone for help securing money for bail after an arrest.  She asked Defendant Simone for money and he instructed Ms. Seitz-Butte to deliver the requested sum.  He then summoned Ms. Ali to return to Seattle.  Defendant Simone was charming and engaged in "love bombing" tactics to convince Ms. Ali that he had changed and that he was willing to make certain compromises.  He permitted her to start smoking hookah.  On August 18, the two returned to Las Vegas and Defendant Simone went so far as to meet Ms. Ali's sister.  This was the first time in six months that he had shown any interest in begin introduced to a family member.  Ms. Ali believed Defendant Simone had changed.

151.     The honeymoon did not last.  On September 6, Defendant Simone flew Ms. Ali to Seattle again.  They spent the day doing activities he deemed necessary.  By the time they got to the Airport Way property around 3am, restaurants were closed and Ms. Ali had to go to sleep hungry.  When she was not tending to whatever needs he set forth, he forced her to remain inside the sleeping pods.  She was not allowed to leave without his permission.  He then flew Ms. Ali back to Las Vegas.

152.     Defendant Simone forced Ms. Ali and Ms. Seitz-Butte to sit in the courtroom with him during Ms. Mortenson's protection order hearing in Las Vegas.  She felt awkward and confused and did not want to be a part of it because she knew that everything Ms. Mortenson had alleged was true.  Defendant Simone responded by saying that Ms. Mortenson was crazy.  Ms. Ali began questioning her own sanity.  The routine continued after that.

153.     On November 14, 2017 Defendant Simone stated that he would spend a day with Ms. Ali, but he never showed up.  By the time he did show up, Ms. Ali was expected to be



JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

getting ready to go to the club and dance.  She instead wanted to spend time with him, but he told her no.  When she complained, he slapped her face and strangled her, asking "did you hear me?"  She whispered "yes" and he let her go to get dressed for work.  Once she was dressed, he complimented her appearance and drove her to the club.  On the way, he stopped on a side street and forced her to perform oral sex on him.

154.    On December 26, at an apartment in seattle that Defendant Simone forced Ms. Ali to rent in to keep a closer eye on her, he strangled her so hard during a rape that several blood vessels in her eyes popped.  He also pulled her hair so hard that most of her natural hair, which sat underneath a hair, weave fell out at the salon the following day.

155.    On December 29, 2017 Defendant Simone slapped, beat, and strangled Ms. Ali in the Seattle apartment for again talking to Ms. Seitz-Butte without permission and telling her about a photo shoot.  He called her a "disrespectful bitch" during the attack.

156.    On February 4, 2018 Defendant Simone flew Ms. Ali to Minnesota and forced her to dance there for Superbowl weekend.  He did not book her a hotel, and she was forced to stay with her family, which meant attempting to hide all of her dancing clothes and paraphernalia from them.  She was fearful the entire time that she would be discovered.  This weekend was also her sister's birthday, but Defendant Simone did not permit her to celebrate – he forced her to dance instead.

157.    Ms. Ali finally broke free from Defendant Simone on February 21, 2018.  She secured permission to go out with a neighbor and drank that night.  With a little liquid courage, she ignored a message from him.  In response to the second, she said "I'm out right now, I will call you when I get home."  When the barrage of messages came after, she ignored them.  She told her neighbor she did not feel safe going home that night and the neighbor agreed to let her



JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

stay over.  Once safely at the neighbor's home, she called Simone crying.  She told him she understood what he had done it her and that she would not let it continue.  Defendant Simone attempted to gaslight her and claim that none of it had ever happened.  Ms. Ali flew her best friend out to Las Vegas to stay with her for a week to ensure that she did not attempt to reconnect with Defendant Simone.

<u>The Aftermath.</u>

158.    Ms. Ali remained in Las Vegas as a dancer for nearly two years because it was all she knew.  She had no real job prospects otherwise and completely lacked any sort of support system.  She was unable to return to her family in Minnesota because Somali culture, which has deep conservative roots in Islam, would never accept a woman who had a history of stripping.  She would have been a complete outcast from her community, and as a result, her family would have to distance themselves from her or face recrimination within the community.

159.    Ms. Ali traveled to Texas briefly in 2020.  She remained there for several months before eventually reluctantly returning to Minnesota.  She has been ostracized by her family.  Her father and siblings will not speak to her and her relationship with the remaining family members is strained.  She tragically lost her fiancé to suicide and feels completely alone.

160.    Ms. Ali suffers from depression, anxiety, and post-traumatic stress disorders.  She has struggled with suicidal ideation and has survived a suicide attempt.  She cries almost every day when she imagines what other women are still enduring.  She suffers sleep disorders, eating disorders, and body dysmorphia.

161.    In total, Defendant Simone took approximately half a million dollars from Ms. Ali.  She never recouped that money.

162.    Ms. Ali will never be her old self again.

Johannessen Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

**Angelica Campbell's Story.**

<u>Meeting Raz and Black Umbrella.</u>

163.    Ms. Campbell was emerging from homelessness as an aspiring young artist in late 2017 in Chicago, Illinois.  Through her Instagram platform, she was contacted by Defendant Howell, who expressed an interest in her art.  He described Ms. Campbell's art as "dope" and stated that he wanted to establish an ongoing correspondence.  Defendant and Gant also approached Ms. Campbell and initiated social media connections with her, commenting upon her art.

164.    Thereafter, Defendant Howell began traveling to Chicago twice per year to visit his family for several days.  Defendant Howell would always visit with Ms. Campbell during his trips.  The two would meet up, talk about art and music, and go their separate ways over the course of several days before Defendant Howell returned home to Seattle.

165.    Upon information and belief, Defendant Howell shared what he learned about Ms. Campbell during discussions with her with Defendant Simone.

166.    During this period, Defendant Howell maintained a social media correspondence with Ms. Campbell.  He discussed her art and made promises of both future purchases of her work and commissions for custom work through an organization with whom he was affiliated, Defendant Black Umbrella.  Defendant Howell represented to Ms. Campbell that "big people" within his organization wanted to meet her.

167.    Defendant Simone participated in a music tour with Jay Park, another artist of whom Ms. Campbell was a fan, in early 2018.  The tour came to Chicago on April 26 of that year.  Ms. Campbell had purchased a "meet and greet" ticket, which gave her backstage access.  Ms. Campbell had given a sample of her artwork to one of the crewmembers, who had passed it



on to Defendant Simone.  The following day, Defendant Simone video called Ms. Campbell to request commissions of several draft pieces of art.  She did so, but was never compensated for her work.  Defendant Simone also encouraged Ms. Campbell to relocate to Seattle during the call, where he said he could help with her art career.  In so doing, Defendant Simone began grooming Ms. Campbell.

168.    Through the remainder of 2018, other members of the Black Umbrella organization began contacting Ms. Campbell.

169.    In June of 2019, Defendant Simone participated in the Mozzy music tour that also made its way through Chicago.  Ms. Campbell was introduced to other members of the Black Umbrella organization, including Defendants Belche, Adams, and Gant.  Prior to the show, the Black Umbrella members engaged Ms. Campbell in a lengthy conversation and caused her to be overserved alcohol by continuing to order drinks for her.  During the conversation, Defendant Howell asked whether Ms. Campbell wanted to meet Defendant Simone after the show.  She was visibly intoxicated at the time, but continued to be served.  Ms. Campbell's intoxication became so severe that she vomited at the club.

170.    After the show, Defendant Simone joined the group and began talking with Ms. Campbell.  Ms. Campbell was still obviously intoxicated.  Defendant Simone invited Ms. Campbell back to his hotel room.  She declined and asked to go home, and Defendant Simone said he would take her.

171.    Instead of taking her home as she had requested, Defendant Simone took Ms. Campbell to his hotel room.  Ms. Campbell vomited a second time just prior to arriving there.  Defendant Simone ordered her food and told her to take a shower.  Once she had showered and eaten, Defendant Simone initiated sexual intercourse while Ms. Campbell was still intoxicated.



JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

172.     Afterwards, the two talked and Defendant Simone asked Ms. Campbell for her life story.  She spoke of her prior troubles, including homelessness, which she had not previously disclosed to him.  Defendant Simone again asked her to move to Seattle.  He claimed he would support her art career.  Ms. Campbell shared that her dream was to own a small, self-sustaining plot of land and raise a family; Defendant Simone promised to make that dream a reality if she would date him and move to Seattle.  This was a significant escalation in Defendant Simone's grooming of Ms. Campbell.

173.     Ms. Campbell agreed, although she was not yet prepared to relocate to Seattle. The two struck up a brief long-distance relationship as Defendant Simone returned to Seattle. Several weeks later, Ms. Campbell found out she had become pregnant from their first night together.  She had not been sexually active for several months prior.  When she asked Defendant Simone for help, he told her to terminate the pregnancy because she could not afford it.  He did not offer any assistance, and she terminated the pregnancy feeling that she had no other options. The decision devastated Ms. Campbell, but she felt she had no other options because she was not financially stable enough to raise a child on her own.

174.     In late November of 2019, Ms. Campbell was assaulted in Chicago.  Although the long-distance relationship had ended, she reached out to Defendant Simone for help.  Defendant Simone said he wanted to rekindle the relationship, promised to fulfill his earlier promises of building a life, family, and a small farm together, and said he was to send her a plane ticket to Seattle.

175.     Several weeks later, Defendant Simone bought her a one-way ticket, and on February 4, 2020, Ms. Campbell packed her two backpacks' worth of possessions and boarded a 6 am flight from Chicago to Seattle with a ticket that Defendant Simone had purchased for her.



JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

Ms. Campbell's Trafficking Ordeal.

176.    Ms. Campbell's nightmare began as soon as her plane touched down.  She arrived at SeaTac Airport on February 4.  She waited at the airport for four hours before Defendant Simone showed up to collect her.  Ms. Campbell entertained herself in the coin-operated massage chairs in the airport for a time, then just waited.

177.    As soon as she got into Defendant Simone's car, he started asking what Ms. Campbell could do for work.  She discussed her experience in customer service and administrative work and noted that she was well suited for such tasks.  Defendant Simone responded that the fasted way to make money was to perform in strip clubs.  He also told Ms. Campbell to create an Only Fans profile.  Only Fans is a paid adult entertainment site upon which performers are paid directly by customers to perform dances or sex acts.  Defendant Simone later created the profile for her.

178.    Ms. Campbell was stunned that Defendant Simone, who professed to love her, would want her to strip and otherwise engage in sex work for a living.  Defendant Simone had told Ms. Campbell that he fell in love with her because she reminded him of his mother, with similarities in voice, personality, dreams, and artistic inclination.

179.    Defendant Simone declared in a dictatorial manner that this is what Ms. Campbell was going to do because it was the best way for her to pay him back for what he had helped her with.  He then grabbed her by the wrist and said in a menacing tone "I'll let you know if you ever do anything to annoy me."

180.    Ms. Campbell, in that moment, felt trapped.  For the first time, it sunk in that she was 2,000 miles from anyone she knew and had two backpacks and no money to her name.  She was entirely at the mercy of Defendant Simone.



J O H A N N E S S E N   L a w
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

181.    Without another word, Defendant Simone drove Ms. Campbell to the King County administration office on 5th Avenue.  He gave her $300 in cash and instructed her to go inside and get her stripping license.  She complied and obtained her license the same day.

182.    After obtaining her license, Defendant Simone took Ms. Campbell to the offices of what he euphemistically referred to as "talent agencies," to submit her application to perform in their clubs.  She was contacted in short order by a person named "Sara," who upon information and belief was Defendant Belche, who informed her that she had received the applications and would review them.  He then bought Ms. Campbell a bowl of soup at a local pho restaurant.  After that, he dropped her off at a Barnes & Noble bookstore and left her there for several hours.  Defendant Simone later sent an Uber to pick her up and brought her to an AirBnb located at 1225 NE 105th St., Seattle, WA.

183.    Defendant Simone later arrived at the AirBnB to have sex with Ms. Campbell.  During intercourse, he started asking her who her god and master and king was.  When she did not answer, Defendant Simone became angry and he pulled Ms. Campbell up forcefully by the shoulder.  He bit her on the neck hard enough to leave a mark, causing her to become fearful of him.  The bite later resulted in a bruise.  She then answered Defendant Simone as he desired, that he was her god and master and king, whenever he had sex with her.  He fell asleep and left early the next morning.  Defendant Simone imposed other rules upon their relationship – she was not allowed to drink, smoke, tell anyone about their relationship, or even tell anyone that she was in Seattle.  If she needed anything, Ms. Campbell was required to ask Defendant Simone and he would bring them.  He exerted total control over her life from the day she arrived.

184.    The next day, Defendant Simone returned to have sex again.  He also brought wigs and sexually suggestive clothing for Ms. Campbell to wear while she was stripping.  The



Johannessen Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

only food he brought her was a bowl of chili, some pumpkin seeds, and two fruit snacks.
Defendant Simone told her to "make it stretch," suggesting that she would not be receiving any
more food for some time.

185.    A few days later, Defendant Simone told Ms. Campbell that "Sarah" would be
contacting her shortly to inform her which clubs she would be permitted to work in. "Sarah"
notified her that she could work at Defendant Talents, specifically its Pandora's club. Ms.
Campbell did not realize at the time, but Defendant Simone had advance notice of this because
of his relationship with Defendant Talents.

186.    Ms. Campbell was taken to Defendant Talents at Pandora's for her first shift on
February 11, 2020. She immediately noticed that the club was not a conventional strip club.
There were very few dancers utilizing the stage. Patrons did not offer tips to dancers. Rather,
dancers solicited patrons for private sex acts. Once dancers took patrons back to a private room
or secluded area, they negotiated a price for a sex act, including anything from kissing to oral sex
to sexual intercourse. Prices were negotiated based upon the act to be performed and the length
of the song, with prices ranging anywhere from $100 to $600. Dancers typically serviced
between 5 to 10 patrons per shift.

187.    Ms. Campbell personally observed approximately half a dozen sex acts being
performed on the premises by dancers within the first hour of her shift. After her own first dance
on stage, she was told by a manager that she did not have to "shake her ass" that much and that
the women in this club did not make their money by dancing, insinuating that she also needed to
begin performing sex acts on patrons for money.

188.    There were three patrons in the bar and she received no tips during her first dance,
and Defendant Simone was not among them. Despite this absence, Ms. Campbell received a



J O H A N N E S S E N   L a w
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

phone call immediately after her first dance from Defendant Simone.  He informed her of the same thing that the manager had told her, that she did not have to dance as hard as she had. Defendant Simone had not been in the club during her dance, and there was no way he could have known how she danced unless the manager had told him about her dance.  Defendant Simone proceeded to tell her that she needed to begin performing sex acts to earn money. Uncomfortable with this arrangement, Ms. Campbell told him she did not want to do it. Defendant Simone told her she would "get used to it," that she owed him for what he had done for her including the plane ticket and lodging, and that performing sex acts for money – in other words, prostitution – was the fastest way to earn money.  He told her to stay strong and she would get through it.

189.     Ms. Campbell's heart sank again as she realized she had no other choice.  She complied and performed multiple sex acts on patrons that night in exchange for money.  She earned approximately $800.  At the end of her shift, she was forced to pay out the club $75 for her "rental fee."  She felt sick at the end of the night.

190.     Defendant Simone arrived to pick her up at the end of her shift.  When she got into his car, he held out his hand and demanded the money she had made.  She gave it to him and kept none for herself.

191.     Defendant Simone dropped her back at the AirBnB and told her to go to work every day.  He told her he expected her to make money every day and that it should not be a problem because it was within walking distance of the AirBnB.

192.     Thereafter, Ms. Campbell worked at one of Defendant Talents' establishments, Pandora's, located at 8914 Lake City Way NE in Seattle.



JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

193.    Ms. Campbell's nightly routine was to go to work, say hello to the other performers, get dressed, and begin working the floor.  She performed oral sex, sexual intercourse, and other acts with patrons at their request to earn money.  She earned approximately $600 per night in her first few weeks, which was still short of her "quota" imposed by Defendant Simone of $1,000 per night.  She never earned a single dollar doing conventional stage dances.  Every night, when Mr. Simone picked her up, he took all the money she had made.  She was occasionally able to hide a $20 bill for herself by tucking it away somewhere on her body.

194.    After the third night, Ms. Campbell became consumed by depression and found it difficult to face the work while sober.  She began using cocaine along with the other dancers to numb herself for what she faced.

195.    After just two weeks, Ms. Campbell's nightly earnings dropped to between $300-400, which Defendant Simone saw as unsatisfactory.  Defendant Simone told her she was not making enough "for the family."  When Ms. Campbell first heard him use this term, she assumed Defendant Simone was referring to the promises of a family and farm that he had made to her back in Chicago, which induced her to reach out to him in her time of need.  She would later find out that he was referring to the network of women he trafficked, and the Black Umbrella organization at large.

196.    Defendant Simone's dissatisfaction with Ms. Campbell's earnings meant that he would not allow her to remain in an AirBnB.  Instead, he moved her to the office property he owns through Defendant Commodity on Airport Way in south Seattle.



Johannessen Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

197.    The Airport Way office building was, for all intents and purposes, a prison.  Ms. Campbell was not permitted to turn on the lights or the heat.  She was monitored with the building's cameras, allowing Defendant Simone to keep an eye on her at all times.

198.    The building was not equipped with bathing facilities, so Ms. Campbell bathed in a bathroom sink and warmed herself near a wall heater in the bathroom.  She washed her clothes in that same sink and let them air dry.

199.    Although the office was equipped with four Japanese sleeping "pods," the temperature in the office was too cold at night to use them, so Ms. Campbell was forced to drag an office chair into the bathroom and sleep near the wall heater to keep warm.  Defendant Simone only provided her with one blanket, which necessitated Ms. Campbell to sleep while wearing her coat as well.

200.    There were no cooking facilities and Defendant Simone provided her with no food, so Ms. Campbell located a nearby food bank and bought herself bread, peanut butter, and apples, subsisting on peanut butter sandwiches and apples.

201.    When Defendant Simone did come to the office property for meetings, Ms. Campbell was forced to shut herself away in one of the sleeping pods and make no noise.  Ms. Campbell was only permitted to leave to walk to the food bank or to go to work at the strip club, for which she was forced to take public transportation and commuted 2 hours in each direction.  Defendant Simone periodically picked her up or sent an Uber to pick her up and brought her back to the office building.  In either case, he met her there and collected the money she made each night.  Her earnings dropped to $100-200 per day.

202.    Ms. Campbell remained imprisoned in the Airport Way office property for nearly three months.  She finally worked up the nerve to leave the "employ" Defendant Talents on or



Johannessen Law PLLC

5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

about March 28, 2020.  After a shift, Defendant Simone dropped Ms. Campbell off at the office building and she told him in tears that she could not do it anymore and that she was feeling suicidal.  This expression infuriated Defendant Simone.  Knowing that Ms. Campbell craved affection, he punished her by not speaking to her or providing anything for her for nearly three weeks until he learned that she had obtained other employment and income.  When she left Defendant Talents, Ms. Campbell became even more dependent upon him.

203.     In mid-April of 2020, Ms. Campbell obtained employment at a Shake Shack in the Westlake neighborhood of Seattle.  She was only employed there for three weeks before the store was shut down due to COVID-19.  Although she only received two paychecks from her work there, both went to Defendant Simone.  He ordered her to take photos of the checks and then cash them and give them the money so that he could verify that she was not shorting him anything.

204.     While she worked at Shake Shack, Defendant Simone again moved Ms. Campbell to another property.  This time, he moved her to a property located at 20918 80th Avenue W., Edmonds, Washington.  While living in Edmonds and working in Westlake, Ms. Campbell was again forced to take public transportation 2 hours each way to work.

205.     After Ms. Campbell was laid off from Shake Shack, she began using the Only Fans profile that Defendant Simone had created for her as a way to earn money.  She earned between $200 and $300 per week.  Ms. Campbell was, for the first time, successful in hiding money from Defendant Simone.  This is the only money she ever earned for herself.  During this time, Ms. Campbell was able to buy herself food for the first time since moving to Seattle.

206.     In late May of 2020, protests concerning the murder of George Floyd began in the Capitol Hill neighborhood of downtown Seattle.  Defendant Simone and members of the Black


JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

Umbrella group were at the forefront of these protests.  The first day of the protests, Ms. Campbell went down march.  Defendant Simone found her amidst the chaos and he instructed her to stay by his side.  As the chaos began to calm, Defendant Simone took Ms. Campbell to a secluded train track to have sex with her, then took her back to the Edmonds property the following day.

207.    The following day, Ms. Campbell was copied on an email from Defendant Belche to a number of the Black Umbrella members.  The email instructed them to meet at the "H.Q.," a euphemism for the Airport Way office, to discuss plans for what would become known as the Capitol Hill Autonomous Zone ("CHAZ"), and later, the Capitol Hill Occupied Protest ("CHOP"), a takeover of several blocks of the Capitol Hill neighborhood, including a police precinct.

208.    Ms. Campbell was present at the meeting, along with Defendants Howell, Gant, Belche, Simone, and others not named in this Complaint.  Defendant Simone dictated a list of weapons to Defendant Belche and issued orders to other members of the group.  Defendant Simone ordered Ms. Campbell to appear at his side at all times of the day and night, effectively as a token black female to legitimize his role as a community leader.

209.    As the protests intensified on June 2, 2020, Ms. Campbell was introduced to Defendant Fulford and Defendant Schlackman.  Upon information and belief, Defendant Schlackman is another victim of Defendant Simone's criminal enterprise, though she presently lacks the ability to free herself.  Ms. Campbell struck up a conversation with Defendant Fulford and learned that she too had been pushed by Defendant Simone to work at the same clubs that she had been forced to work at and had earned her money performing sex acts the same way. Defendant Schlackman also told Ms. Campbell that Defendant Simone operated a drug business

in which Defendant Fulford manufactured cocaine, gave it to Defendant Schlackman to transport to Defendant Simone's various agents, and the agents sold it at the street level. Defendant Adams also reintroduced himself to Ms. Campbell at this time.

210. That evening, Defendant Simone had not provided a way for Ms. Campbell to get back to Edmonds. He then instructed Defendant Schlackman to drive Ms. Campbell back to the Edmonds property. The two talked during the drive and Defendant Schlackman revealed to Ms. Campbell that she too had been forced into stripping and performing sex acts at the same clubs as Ms. Campbell. She also revealed that she was forced to perform on Only Fans, that Defendant Simone kept her money, and that she was one of his "wives."

211. Of note, no public records reveal a marriage license having been filed for Defendant Simone within King County or any surrounding counties.

212. Ms. Campbell wondered aloud, "so we're all fucking him?" Defendant Schlackman confirmed this was the case. It was the first time that Ms. Campbell realized that the "family" that Defendant Simone had referred to was not the family he had promised her, but a network of women he had forced into prostitution.

213. The following morning, Defendant Simone called Ms. Campbell, screaming at her for revealing to Defendant Fulford and Defendant Schlackman that they were together.

214. On June 6, Defendant Simone ordered Ms. Campbell to begin sleeping at the CHOP/CHAZ protest. Defendant Adams was also instructed to stay there in order to monitor her activities. Any time Defendant Adams received a phone call from Defendant Simone, he was required to inform Defendant Simone if he was with Ms. Campbell so that Defendant Simone knew where she was. He remained close to her throughout the remainder of the protests and provided Defendant Simone constant updates.



Johannessen Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

215.     On June 9, 2020 Defendant Simone held a meeting with Defendant Gant in his Mercedes Sprinter van for which Ms. Campbell was present.  It was her birthday.  Defendant Simone had become concerned that old sexual abuse allegations had started to surface on social media and would tarnish his public image.  He consulted with Defendant Gant, who is technically savvy, about how to edit or delete old social media posts to make them more palatable in the current social and political climate.  Halfway through the meeting, Defendant Simone told Ms. Campbell to get out of the car.

216.     During the remainder of the CHOP/CHAZ, Ms. Campbell spent 16 to 18 hours a day at the CHOP/CHAZ at the behest of Defendant Simone during the remainder of the protests.  Defendant Simone largely left Ms. Campbell at the location as the "face" of the movement.  She took over a de facto leadership role because he was largely absent.

217.     It is worthy of note that, contrary to his public face, Defendant Simone' intention during CHOP/CHAZ was never to support the Black Lives Matter movement; it was never to support police reform; it was never to show solidarity with George Floyd.  Defendant Simone wanted to promote himself, and nothing more.

218.     To that end, Defendant Simone became upset when Ms. Campbell began receiving recognition among the members of the CHOP/CHAZ as a leader.  He dispatched Defendant Howell to the location with four unknown men on or about June 10, 2020, who monitored Ms. Campbell's movements from then until the end of the protests and reported her activities back to Defendant Simone.  Ms. Campbell was never alone from that point on until the protests ended.

219.     On the evening of June 10, former President Donald Trump referred to Defendant Simone as a "terrorist" on national television for his actions at CHAZ/CHOP.  Defendant



Simone and the majority of the Black Umbrella members, fearing potential federal government or military reprisal, fled to Defendant Belche's house for a meeting, accompanied by Defendant Gant.  Defendant Howell and the four unknown men prevented Ms. Campbell from entering the meeting and kept watch over her.

220.    Defendant Howell and Ms. Campbell then went on a walk to pass the time.  Ms. Campbell shared some of the concerning things that Defendant Simone had done to her to date. Defendant Howell confessed that he was completely aware of how Defendant Simone treated women, prostituted them, and controlled them with physical coercion and starvation.  However, he concluded by telling her that it was "not a good idea" for her to attempt to get away from him.

221.    On or about the morning of July 1, Defendant Simone telephoned Ms. Campbell and warned her of an impending police raid.  He instructed her that, if arrested, she was not to say anything about him.  She did not react quickly enough.  Police raided and broke up the CHOP/CHAZ that morning.  Ms. Campbell was arrested, but not charged.

222.    When Ms. Campbell was released later that evening, Defendant Simone directed her to return to the park and walk around and updated him on what was going on in the Capitol Hill area.  Ms. Campbell was fortunate to come across a group of protestors that she knew who were staying in a room at the Cloud Hotel, where they invited her to join them, and she stayed for the ensuing week.  She remained there afterwards, effectively having been kicked out of the house in Edmonds by Defendant Simone.

223.    Defendant Simone next moved Ms. Campbell into a condominium located at 425 Vine Street, Unit 604, Seattle, Washington. Defendant Simone claimed to own this property, but in fact, public records reveal that it was owned by Defendant Schlackman.[2]  Upon information

---

[2] In fact, this very property was the subject property that Defendant Simone utilized in a scheme to defraud one Veronica Seth earlier in 2020 by promising her a share of ownership in exchange for $30,000.  He was, of course,

Johannessen Law
PLLC

5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

and belief, Defendant Simone forced Defendant Schlackman to rent the condominium out on AirBnB and took the proceeds from her, similar to his schemes with other women.  Defendant Adams was also moved to this apartment and continued monitoring her movements and reporting them back to Defendant Simone.

224.    Defendant Simone moved approximately ten people into the modest condominium, limiting sleeping space.  Ms. Campbell slept on the floor and had no privacy while she stayed in the condominium, which went on for approximately two weeks.  Defendant Simone "charged" the occupants $70 per occupant per day.  Ms. Campbell could not afford to pay.

225.    On July 7, while she was staying at the condominium on Vine Street, Defendant Simone forcibly raped Ms. Campbell.  He arrived at the condominium and ordered her to come down to this vehicle, a white Tesla with gullwing doors.  She entered the back of the vehicle where he was sitting and he began interrogating her as to whether she had been cheating on him with anyone in the condo.  When she told him no, he grabbed her by the head and back of the neck, forcing her head down to his lap to perform oral sex on him.  So forcible was the attack that Ms. Campbell found herself choking and unable to breathe.  She attempted to hit Defendant Simone and push him away.  When she broke free for a moment, Defendant Simone grabbed her again, turned her around, and raped her from behind while he continued to strangle her with his hands.  The intercourse was extremely painful, and the choking was so severe that Ms. Campbell momentarily lost consciousness.

226.    Ms. Campbell became pregnant from this rape.  She later miscarried.

---

not the owner of the property and had no legal right to sell anything.  A judgment entered against Defendant Simone in that case for his failure to answer, no. 21-2-01878-1 SEA. Defendants Fulford and Commodity Properties were co-defendants in that action, and also failed to answer.  Judgments were entered jointly and severally against all named defendants in that action.  Defendant Schlackman purportedly sold the property to one Adam McCall in July of 2021.  Mr. McCall is a known associate of Defendant Simone.

JOHANNESSEN LAW
PLLC

5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

227.     When Defendant Simone was finished, Ms. Campbell returned to the condo.  She used the bathroom and discovered she was bleeding from her vagina from the viciousness of the rape.  She locked herself in a room and cried the rest of the night.

228.     On or about July 14 or 15, Defendant Simone moved Ms. Campbell to his property at 14715 31st St. NE in Shoreline, Washington.  The house was completely unfurnished and the carpet was filthy.  The oven had no cooking racks.  Defendant Simone also moved Defendant Adams into the Property, who was to reside on the lower level.  Defendant Simone charged her and Defendant Adams $1,500 each to reside in the house.  Defendants Fulford and Schlackman were present the day Ms. Campbell was moved into the Shoreline house, and Defendant Schlackman informed her that her father had set up the locks in the property and to let her know if there were any problems accessing the property.

229.     Defendant Simone made grandiose promises to Ms. Campbell.  He promised that this would be the house where they eventually built their family.  He told Ms. Campbell to create a business plan and that, with that and a list of materials, he would help her turn the house into an art studio/museum.  He promised to build a vegetable garden.

230.     Ms. Campbell tendered a business plan and list of materials the following day.  Defendant Simone did absolutely nothing about it.  Instead, Ms. Campbell slept on the floor, yet again.  She got hives from the carpet she slept on.  On top of that, Defendant Adams turned out to be disgusting roommate, necessitating Ms. Campbell to clean up after him on a regular basis.

231.     In late August or early September 2020, Ms. Campbell accompanied Defendant Adams to take food to Defendant Essig.  Defendant Adams informed Ms. Campbell that Ms. Essig was the "money" behind Defendant Simone and the Black Umbrella organization – she paid for Defendant Simone's travel on the Mozzy tour during which they had met, the purchase



Johannessen Law
PLLC

5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

of $30,000 worth of sunglasses, she assisted him with the purchase of a Tesla automobile, and she funneled him money from her Only Fans site.  Later, during a telephone argument with Defendant Essig on November 25, 2020, Defendant Essig confirmed everything to Ms. Campbell that Defendant Adams had previously told her and complained that he talks too much.

232.    In mid-August, Defendant Simone visited the Shoreline property accompanied by Defendant Schlackman and told Ms. Campbell that she was obligated to begin making money again.  He told Ms. Campbell matter-of-factly that she was going to help him sell cocaine.

233.    Defendant Simone explained that "Katie [Fulford] makes the shit," and that Defendant Schlackman would then deliver it to the various street-level dealers, including Defendant Adams.  Cocaine was to be sold at a rate of $180 per gram.  Defendant Simone told Ms. Campbell that her role would be to use her connections in the strip clubs to bring in new customers for Defendant Adams to sell to.

234.    Over the course of a month and a half, Defendant Schlackman would deliver new cocaine whenever Defendant Adams reported back to her that the prior batch had been sold.  She would provide the new batch to Defendant Adams, who would turn over the money to Defendant Schlackman to deliver back to Defendant Simone.  Once Defendant Adams had the cocaine in hand, he would press Ms. Campbell for contacts and customers to purchase it.  This pattern repeated at least five times during that month and a half, and in that time, Ms. Campbell was able to secure approximately 12 new, regular purchasers for Defendant Adams and Defendant Simone.  Defendant Simone was initially satisfied with this.

235.    In early September, Defendant Simone came to the Shoreline property and again accused Ms. Campbell of cheating on him.  He locked her in a room and confronted her, further telling her to get into a closet that he also had the ability to lock from the outside.  During the



conversation, Ms. Campbell insisted that she was not with anyone else, but asked in passing why it was okay for Defendant Simone to have other sexual partners (such as Defendant Fulford and Defendant Schlackman), but not her.  His eyes grew wide and she felt like the look on his face meant that he was going to kill her.  Defendant Simone drew back his hand as if to strike her, and Ms. Campbell apologized and attempted to pass the remark off as a joke because she was terrified of being beaten or killed.  During the entire confrontation, Defendant Simone stood looming over Ms. Campbell as she cowered in the closet.

236.    Near the end of September, Ms. Campbell secured a position as a delivery driver with Amazon Flex.  Defendant Simone initially allowed her to borrow a Lincoln automobile he owned, but took it back after three days.  Ms. Campbell quickly had to secure new transportation to keep her job.  She had recently been commissioned to complete a painting and had earned a modest fee for her work, which she used to rent a car so that she could continue making local deliveries.  Ultimately, however, almost all of her earnings went to pay for the car rental and gas and she had little left over to give to Defendant Simone.

237.    Defendant Simone took screenshots of Ms. Campbell's schedule so that he knew when she was working, and because she was paid hourly, he knew exactly how much she would be earning.  Once she was paid, he forced her to transfer whatever pay remained after gas and the car rental, which only amounted to about $100 per week.

238.    Defendant Simone was furious with how little Ms. Campbell was making.  On October 13, later in the evening, he drove Ms. Campbell to Aurora Avenue and instructed her to prostitute herself on the street.  He said that this was the best way for her to make money and pay him back the approximately $60,000 he claimed that she owed him.  He told her that his "territory" was between 125th and 145th streets.  He gave her instructions that, when she picked



Johannessen Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

up a customer, she was to go to a specific motel and that he would meet her to collect the money when she was finished. Before he dropped her off, he told her that she would never make any money as an artist.

239. Ms. Campbell spent that night walking the streets alone, freezing, and terrified. She refused to prostitute herself any further. When Defendant Simone called her early the next morning, on October 14, and asked if she had gotten the hotel room, she told him no. He responded that she had to get out of the house. Ms. Campbell returned briefly to the Shoreline house and picked up the two backpacks she had arrived with. Defendant Simone later instructed Ms. Campbell to meet him at a remote parking lot, where he delivered her Doordash delivery bag and a piece of mail and told her she would be safe sleeping there. He gave the items to her and left her there.

240. Defendant Simone left Ms. Campbell to sleep in a parking lot alone with her two backpacks worth of possessions. That is how he ended their relationship.

The Aftermath.

241. Ms. Campbell again found herself homeless for a short time. She slept in a rental car in a park for four nights and had experienced suicidal thoughts. Defendant Simone regularly drove by to monitor her during this time. On October 21, a friend found Ms. Campbell sleeping in the park and took her to the hospital, where she remained on suicide watch for 72 hours. Thereafter, through the grace of a number of local organizations, including the DESC Crisis Solutions Center, the Salvation Army Women's Shelter, and REST, Ms. Campbell was eventually able to get back on her feet. She now has a modest but steady job and her own apartment.



JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

242.   However, she is just barely meeting her own needs.  Ms. Campbell now suffers from severe depression and post-traumatic stress disorder.  She experiences insomnia and suffers vivid nightmares the rare occasions when she is able to sleep.  Her PTSD often makes it challenging to control her emotions, and she has had a number of outbursts that have harmed her employment.  Her current job is not the first job she has had since leaving Defendant Simone.  She continues to struggle with suicidal ideation and has difficulty maintaining friendships and social connections due to the behaviors she exhibits as a result of her trauma.

243.   She also faces the ongoing presence of Defendant Simone and his entourage. Members of the Black Umbrella organization frequently show up in public places at which Ms. Campbell is socializing or working and watch her.  Recently, at an art show at the Vermillion Gallery on June 3, Ms. Campbell found herself effectively surrounded by every member of the Black Umbrella organization, including Defendant Howell, Defendant Gant, Sean Kelly (a "hit man" for Defendant Simone), Defendant Adams, and others.  She frequently observes Defendant Simone's signature white gullwing Tesla drive by, or park near, her apartment or work on a weekly basis.  She has memorized the license plate number.  In keeping with his pattern of creating outrageous music videos after one of his victims escapes, Defendant Simone released the song "Different Types a Fitness" shortly after her escape in which he loudly claims that he did not sex traffic Ms. Campbell, never took her money, and that in fact, she took his money.

244.   Ms. Campbell was defrauded, trafficked, terrorized, abused, and prostituted by Defendant Simone for 8 months, and the members of his organization facilitated it.  The Defendants took Ms. Campbell's life, even though they left her breathing.

**Megdalena Perez's Story.**

<u>Friendship with Defendant Essig</u>.



245.    Ms. Perez has known Defendant Essig for years.  They were introduced by a mutual friend.

246.    In late summer of 2020, Defendant Essig reached out to meet with Ms. Perez for lunch.  During this meeting, Defendant Essig and Ms. Perez discussed the idea of setting up a "Bella Umbrella" profile on OnlyFans for purposes of gaining an additional fan base and income as a "promotor."  A promotor is one who takes the content of other creators, posts it on their own profile and profits from it, but also "tags" the creator so that users can find additional content by that creator.  Defendant Essig said that that the name "Bella Umbrella" was a takeoff on Defendant Simone's "Black Umbrella" name and that the association was intended to launch off of that name's success.

247.    Defendant Essig talked about Ms. Perez's personal OnlyFans page.  At the time, she did not have one yet because she was having problems with getting her identification accepted.  Defendant Essig told her that if it got declined, to text her about it and she would get it approved.  Ms. Perez did so and Defendant Essig got the issue cleared up the following day.

248.    Ms. Perez asked how much it was to promote on Defendant Essig's "Bella Umbrella" page and she indicated that, at fist, it would be for free.  Defendant Essig indicated that she would need a copy of Ms. Perez's identification, several photographs, and a 5-minute video in order to promote her.  At all times relevant, Defendant Essig represented that "Bella Umbrella" was her entity and that she owned it.

249.    In light of their years' of friendship and the intrinsic bond among sex workers, Ms. Perez trusted Defendant Essig to follow through on her commitment.  In fact, "Bella Umbrella" was, at the time, a pseudonym for the username "@stillsirens," which is in fact owned by Defendant Simone.



250.     In early November of 2020, Ms. Perez transmitted personal, sexually explicit content to Defendant Essig on the promise that her "Bella Umbrella" brand would promote it on OnlyFans.  The same day, the @stillsirens page owned by Defendant Simone posted Ms. Perez's content on OnlyFans.

251.     When Ms. Perez asked in early December how much Ms. Essig had made from her content on Bella Umbrella, she responded "a few thousand dollars."  Ms. Essig never gave Ms. Perez dime of that money.

252.     In late November of 2020, Defendant Essig sought to use Ms. Perez as an instrument to investigate the claims of abuse made by Ms. Campbell against Defendant Simone so that Defendant Simone could "destroy her."  Defendant Essig became upset that Ms. Perez had engaged in a conversation with Ms. Campbell and believed her claims of abuse.

253.     In retaliation, Defendant Essig subscribed to Ms. Perez's separate OnlyFans account so that she could access her content and download it.  She then created a phony Facebook page under the pseudonym "Liz Patrice" so that she could access Ms. Perez's friends and family members.

254.     Thereafter, Defendant Essig engaged in a campaign of harassment, which began in December of 2020, against Ms. Perez and her family and friends.  Defendant Essig used the "Liz Patrice" pseudonym to send Facebook messages to Ms. Perez's her children and nephews, stating that she was a prostitute and including explicit images of her OnlyFans content.  She accused Ms. Perez of having a "thing" for her adopted son, and he believed her, which has resulted in Ms. Perez losing her relationship with him.  Defendant Essig's campaign against Ms. Perez and her eldest son comes through text messages.  Although Defendant Essig disguises the phone numbers she uses, her chosen vernacular has become familiar to Ms. Perez.



5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

255.    This campaign of harassment is ongoing.  Ms. Perez most recently received harassing content in September.

256.    Additional facts shall be set forth as necessary.

**COUNT I:**
**BATTERY (MS. BRANCH, MS. MORTENSON, MS. ALI, AND MS. CAMPBELL AGAINST DEFENDANT SIMONE)**

257.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

258.    Defendant Simone repeatedly, and regularly, subjected Plaintiffs to unwanted and uninvited offensive physical contact.  Such offensive contact included beating, kicking, biting, waterboarding, strangling to the point of unconsciousness, and rape.

259.    Defendant Simone intended the offensive contact to cause Plaintiffs harm and intended to engage in the harmful conduct.

260.    As a result of the offensive contact to her person by Defendant Simone, Plaintiffs have both suffered severe physical and emotional injury.

**COUNT II:**
**ASSAULT (MS. BRANCH, MS. MORTENSON, MS. ALI, AND MS. CAMPBELL AGAINST DEFENDANT SIMONE)**

261.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

262.    Defendant Simone repeatedly and regularly caused Plaintiffs apprehension of harmful and offensive conduct.  Such examples as to Ms. Branch include Defendant Simone telling her it "wouldn't be a good idea" for her to come home unless he told her.  Such examples to Ms. Mortenson include instructing her that she was not permitted to speak with anyone and threatening what consequences would be visited upon her if she "disobeyed" him.  Such examples as to Ms. Ali include telling her "when I call, you better answer" and asking her who she "belongs" to  Such examples as to Ms. Campbell include grabbing her wrist and stating that he would tell her when she annoyed him, telling her she would "get used to it" when she

Johannessen Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

objected to being prostituted, and when cornered her in a closet, berated her, and looked as if he was going to strike her before she was forced to apologize to him.

263.    Plaintiffs had a right to be free from mental disturbance and personal integrity.

264.    Defendant Simone intended his actions to cause fear and apprehension to Plaintiffs.

265.    Plaintiffs' respective fear of imminent harm was reasonable under the circumstances.

266.    As a result of the imminent fear of harm caused by Defendant Simone, Plaintiffs suffered severe emotional injury.

<u>**COUNT III:**</u>
<u>**FALSE IMPRISONMENT (MS. BRANCH AGAINST DEFENDANT SIMONE; MS. MORTENSON, MS. ALI AND MS. CAMPBELL AGAINST DEFENDANTS SIMONE AND COMMODITY PROPERTIES)**</u>

267.    Plaintiffs incorporates all preceding paragraphs as if fully set forth herein.

268.    Defendant Simone imprisoned Ms. Branch by depriving her of her liberty.

269.    Defendant Simone did so by depriving Ms. Branch of her ability to choose where she stayed and worked when he shipped her out to other cities and forced her to stay there for months on end.

270.    Defendant Simone accomplished this by threat of force, coercion, and monitoring Ms. Branch's movements.  He also maintained sole control of her ability to return home.

271.    Defendant Simone's actions were the direct and proximate cause of Ms. Branch's imprisonment.

272.    Defendant Simone imprisoned Ms. Mortenson by depriving her of her liberty.



Johannessen Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

273.     Defendant Simone did so by depriving Ms. Mortenson of her ability to choose where she stayed and worked when he shipped her out to other cities and forced her to stay there for months on end.

274.     Defendant Simone accomplished this by threat of force, coercion, and monitoring Ms. Mortenson's movements.  He also maintained sole control of her ability to return home.

275.     Defendant Simone's actions were the direct and proximate cause of Ms. Mortenson's imprisonment.

276.     Defendant Commodity Properties is the owner of the office building on Airport Way, where Ms. Mortenson was held for a time.  Defendant Commodity Properties, as a facility where Ms. Mortenson was held, was complicit in her imprisonment.

277.     Defendant Simone imprisoned Ms. Ali by depriving her of her liberty.

278.     Defendant Simone did so by depriving Ms. Ali of her ability to choose where she stayed and worked when he shipped her out to other cities and forced her to stay there for months on end.

279.     Defendant Simone accomplished this by threat of force, coercion, and monitoring Ms. Ali's movements.  He also maintained sole control of her ability to return home.

280.     Defendant Simone's actions were the direct and proximate cause of Ms. Ali's imprisonment.

281.     Defendant Commodity Properties is the owner of the office building on Airport Way, where Ms. Ali was held for a time.  Defendant Commodity Properties, as a facility where Ms. Ali was held, was complicit in her imprisonment.

282.     Defendant Simone imprisoned Ms. Campbell by depriving her of her liberty.



Johannessen Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

283.     Defendant Simone did so by depriving Ms. Campbell of her ability to make her own lawful choice as to where to live.

284.     Defendant Simone accomplished this by threat of force, coercion, and monitoring Ms. Campbell's movements.  He monitored her by checking her phone, social media, and utilizing security cameras.  He required her to ask permission to go anywhere and confirm her schedule with him.

285.     Defendant Simone's actions were the direct and proximate cause of Ms. Campbell's imprisonment.

286.     Defendant Commodity Properties is the owner of the office building on Airport Way, where Ms. Campbell was held for a time.  Defendant Commodity Properties, as a facility where Ms. Campbell was held, was complicit in her imprisonment.

287.     As a result of their imprisonment by Defendants Simone and Commodity Properties, Plaintiffs have suffered severe physical and emotional injury.

**COUNT IV:**
**OUTRAGE/INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (MS. BRANCH AND MS. MORTENSON AGAINST DEFENDANT SIMONE; MS. ALI AGAINST DEFENDANT SIMONE AND DEFENDANT FULFORD MS. HILTS AGAINST DEFENDANT SIMONE AND DEFENDANT ESSIG; MS. CAMPBELL AGAINST ALL DEFENDANTS)**

288.     Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

289.     There is no specific tort under Washington law for a network of persons who conspire to sex traffic another human being.  The tort of outrage, or intentional infliction of emotional distress, is therefore the most appropriate corollary.

290.     Defendant Simone exhibited extreme and outrageous conduct by his trafficking of Ms. Branch.  That trafficking was characterized by a framework in which Defendant Simone forced Ms. Branch to travel to other cities to perform in strip clubs, constituting both involuntary



JOHANNESSEN Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

servitude and sexually explicit acts as defined by RCW 9A.40.100, and stole all of the money she made.  He used physical violence, sexual violence, starvation, and the threats of the same to force Ms. Branch into involuntary sexual servitude.

291.    Defendant Simone exhibited extreme and outrageous conduct by his trafficking of Ms. Mortenson.  That trafficking was characterized by a framework in which Defendant Simone forced Ms. Mortenson to travel to other cities to perform in strip clubs, constituting both involuntary servitude and sexually explicit acts as defined by RCW 9A.40.100, as well as sex trafficking under Nev. Rev. Stat. 201.300, facilitating sex trafficking under Nev. Rev. Stat. 200.468, and involuntary servitude under Nev. Rev. Stat. 200.463, and stole all of the money she made.  He used physical violence, sexual violence, starvation, and the threats of the same to force Ms. Mortenson into involuntary sexual servitude.

292.    Defendant Simone exhibited extreme and outrageous conduct by his trafficking of Ms. Ali.  That trafficking was characterized by a framework in which Defendant Simone forced Ms. Ali to travel to other cities to perform in strip clubs, constituting both involuntary servitude and sexually explicit acts as defined by RCW 9A.40.100, as well as sex trafficking under Nev. Rev. Stat. 201.300, facilitating sex trafficking under Nev. Rev. Stat. 200.468, and involuntary servitude under Nev. Rev. Stat. 200.463, and stole all of the money she made.  He used physical violence, sexual violence, starvation, and the threats of the same to force Ms. Ali into involuntary sexual servitude.

293.    Defendant Fulford was complicit in the scheme to traffic Ms. Ali by virtue of her having provided material support to Defendant Simone.  Defendant Fulford routinely provided transportation and other servies to Defendant Simone despite being fully aware of his conduct. She further perpetuated his abusive conduct by training Ms. Ali about a number of aspects of



Defendant Simone's trafficking operation, including his rules.  Defendant Fulford's conduct was extreme and outrageous because she knew she was an accomplice to Defendant Simone in his trafficking of Ms. Ali, and because her ongoing conduct after her escape only served to further traumatize Ms. Ali.

294.     Defendant Simone exhibited extreme and outrageous conduct by his trafficking of Ms. Campbell.  That trafficking was characterized by a framework in which Defendant Simone forced Ms. Campbell into prostitution and drug dealing, constituting both involuntary servitude and sexually explicit acts as defined by RCW 9A.40.100, and stole all of the money she made. He used physical and sexual violence, starvation, and the threats of the same, as well as threats of homelessness, to force Ms. Campbell into involuntary sexual servitude.

295.     Defendant Belche was complicit in the scheme to traffic Ms. Campbell by virtue of her knowledge of Defendant Simone's scheme and her participation in it.  Defendant Belche acted as Defendant Simone's agent and knew, or should have known, that the clubs that Defendant Simone was forcing Ms. Campbell to work in were clubs that required dancers to engage in sexually explicit acts and commercial sex acts as defined by RCW 9A.40.100(6). Defendant Belche's conduct was extreme and outrageous because she knew she was an accomplice to Defendant Simone in his trafficking of Ms. Campbell.

296.     Defendant Essig was complicit in the scheme to traffic Ms. Campbell by virtue of her funding Defendant Simone and Black Umbrella's activities.  By financing the operations, Defendant Essig effectively promoted prostitution as defined by RCW 9A.88.080.  Defendant Essig's conduct was extreme and outrageous because she knew she was an accomplice to Defendant Simone in his trafficking of Ms. Campbell.



297.    Defendant Gant was complicit in the scheme to traffic Ms. Campbell by virtue of his having provided material support and counsel to Defendant Simone in all of his business dealings.  Defendant Gant further perpetuated his abusive conduct by harassing and stalking Ms. Campbell after she left Defendant Simone, threatening her via text message and regularly appearing in public places to stalk her and monitor her activities in the months after she escaped. Defendant Gant's conduct was extreme and outrageous because he knew he was an accomplice to Defendant Simone in his trafficking of Ms. Campbell, and because his ongoing conduct after her escape only served to further traumatize Ms. Campbell.

298.    Defendant Howell was complicit in the scheme to traffic Ms. Campbell by virtue of his having provided material support and "muscle" to Defendant Simone's operation, including on more than one occasion, providing bodyguards to restrict Ms. Campbell's movements at Defendant Simone's direction.  Defendant Gant further perpetuated his abusive conduct by harassing and stalking Ms. Campbell after she left Defendant Simone, threatening her via text message and regularly appearing in public places to stalk her and monitor her activities in the months after she escaped.  Defendant Howell's conduct was extreme and outrageous because he knew he was an accomplice to Defendant Simone in his trafficking of Ms. Campbell, and because his ongoing conduct after her escape only served to further traumatize Ms. Campbell.

299.    Defendant Commodity Properties was complicit in the scheme to traffic Ms. Campbell by virtue of being the owner of the Airport Way property, where Ms. Campbell was imprisoned against her will while she was forced to work as a prostitute in a strip club. Defendant Commodity Properties' conduct was extreme and outrageous because it is wholly



owned by Defendant Simone, who had knowledge of the acts of imprisoning and trafficking Ms. Campbell.

300.    Defendant Black Umbrella was complicit in the scheme to traffic Ms. Campbell by virtue of being the corporate front through which Defendant Simone legitimizes his business. Each and every one of Defendant Simone's surrogates identifies as being a "member" of Black Umbrella.  Defendant Black Umbrella's conduct was extreme and outrageous because it is wholly owned by Defendant Simone, who had knowledge of the acts of imprisoning and trafficking Ms. Campbell

301.    Defendant Fulford was complicit in the scheme to traffic Ms. Campbell by virtue of her having provided material support to Defendant Simone and running his drug manufacturing and distribution operation, which included recruiting Ms. Campbell to seek out new customers to sell to.  Defendant Fulford further perpetuated his abusive conduct by harassing and stalking Ms. Campbell after she left Defendant Simone, threatening her via social media, and regularly appearing in public places to stalk her and monitor her activities in the months after she escaped.  Defendant Fulford's conduct was extreme and outrageous because she knew she was an accomplice to Defendant Simone in his trafficking of Ms. Campbell, and because her ongoing conduct after her escape only served to further traumatize Ms. Campbell.

302.    Defendant Talents was complicit in the scheme to traffic Ms. Campbell by virtue of facilitating and fostering an environment in which commercial sex acts, as defined by RCW 9A.40.100, were performed by dancers, including Ms. Campbell, against her will.  Defendant Talents knew, or should have known, that such acts were occurring and were unlawful. Defendant Talents' conduct was extreme and outrageous because it received Ms. Campbell as a



Johannessen Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

performer knowing that she had been sent by a known trafficker and encouraged her to engage in commercial sex acts, effectively forcing her into prostitution.

303.    Defendant Adams was complicit in the scheme to traffic Ms. Campbell by virtue of his having provided material support to Defendant Simone and assisting with his drug manufacturing and distribution operation, which included recruiting Ms. Campbell to seek out new customers to sell to.  Defendant Adams further perpetuated his abusive conduct by harassing and stalking Ms. Campbell after she left Defendant Simone and regularly appearing in public places to stalk her and monitor her activities in the months after she escaped.  Defendant Adams' conduct was extreme and outrageous because he knew he was an accomplice to Defendant Simone in his trafficking of Ms. Campbell, and because his ongoing conduct after her escape only served to further traumatize Ms. Campbell.

304.    Defendant Schlackman was complicit in the scheme to traffic Ms. Campbell by virtue of her having provided material support to Defendant Simone and running his drug manufacturing and distribution operation, as well as shielding certain assets by titling real property in her name.  Defendant Schlackman further perpetuated his abusive conduct by harassing and stalking Ms. Campbell after she left Defendant Simone, threatening her via social media, and regularly appearing in public places to stalk her and monitor her activities in the months after she escaped.  Defendant Fulford's conduct was extreme and outrageous because she knew she was an accomplice to Defendant Simone in his trafficking of Ms. Campbell, and because her ongoing conduct after her escape only served to further traumatize Ms. Campbell.

305.    This conduct is so outrageous in character and extreme in degree as to go beyond all possible bounds of human decency.



306.    As a result of Defendants' conduct, Plaintiffs have suffered severe emotional and physical injury.

## COUNT V:
## NONPAYMENT OF RENTS OWED FOR OCCUPIED REAL PROPERTY (MS. BRANCH AGAINST DEFENDANT SIMONE)

307.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

308.    Defendant Simone forced Ms. Branch to rent out her apartment on AirBnB, resulting in approximately $22,000 in proceeds over the course of more than a year.

309.    As the leaseholder, Ms. Branch was entitled to realize those proceeds; however, they were deposited into the accounts of Defendant Simone.

310.    Defendant Simone failed to tender the proceeds to Ms. Branch.

311.    Ms. Branch is entitled to recover the full amount of rents owed to her.

312.    As a result of Defendant Simone's unlawful conduct, Ms. Branch has suffered damages.

## COUNT VI:
## WASHINGTON CRIMINAL PROFITEERING ACT, RCW 9A.82 (MS. BRANCH AND MS. MORTENSON AGAINST DEFENDANT SIMONE; MS. ALI AGAINST DEFENDANT SIMONE AND DEFENDANT FULFORD; MS. HILTS AGAINST DEFENDANT SIMONE AND DEFENDANT ESSIG; MS. CAMPBELL AGAINST ALL DEFENDANTS)

313.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

314.    Defendant Simone violated the Washington Criminal Profiteering Act (the "WCPA") by trafficking Ms. Branch.  That trafficking was characterized by a framework in which Defendant Simone forced Ms. Branch to travel to other cities to perform in strip clubs, constituting both involuntary servitude and sexually explicit acts as defined by RCW 9A.40.100.

315.    Defendant Simone violated the WCPA by trafficking Ms. Mortenson and forcing her into involuntary servitude.  That trafficking was characterized by a framework in which



Johannessen Law PLLC

5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

Defendant Simone forced Ms. Mortenson to travel to other cities to perform in strip clubs and periodically engage in prostitution, constituting both involuntary servitude and sexually explicit acts as defined by Nevada law: sex trafficking under Nev. Rev. Stat. 201.300, facilitating sex trafficking under Nev. Rev. Stat. 200.468, and involuntary servitude under Nev. Rev. Stat. 200.463.

316.   Defendant Simone violated the WCPA by trafficking Ms. Ali and forcing her into involuntary servitude.  That trafficking was characterized by a framework in which Defendant Simone forced Ms. Ali to travel to other cities to perform in strip clubs and periodically engage in prostitution, constituting both involuntary servitude and sexually explicit acts as defined by Nevada law: sex trafficking under Nev. Rev. Stat. 201.300, facilitating sex trafficking under Nev. Rev. Stat. 200.468, and involuntary servitude under Nev. Rev. Stat. 200.463.

317.   Defendant Fulford violated the WCPA by assisting Defendant Simone in the trafficking of Ms. Ali.  Defendant Fulford was directly responsible for recruiting and maintaining control of Ms. Ali early in her trafficking ordeal.

318.   Defendant Simone violated the WCPA by trafficking Ms. Campbell.  That trafficking was characterized by a framework in which Defendant Simone forced Ms. Campbell into prostitution and drug dealing, constituting both involuntary servitude and commercial sex acts as defined by RCW 9A.40.100.  Defendant Simone was likewise the leader of organized crime as defined by RCW 9A.82.060, having built a network to run his criminal enterprise.

319.   Defendant Belche violated the WCPA by assisting Defendant Simone in the trafficking of Ms. Campbell and promoting prostitution.  Defendant Belche acted as Defendant Simone's agent and knew, or should have known, that the clubs that Defendant Simone was



J O H A N N E S S E N   L a w
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

forcing Ms. Campbell to work in were clubs that required dancers to engage in sexually explicit acts and commercial sex acts as defined by RCW 9A.40.100(6).

320.    Defendant Essig violated the WCPA by assisting Defendant Simone in the trafficking of Ms. Campbell and promoting prostitution.  Defendant Essig funded Defendant Simone and Black Umbrella's unlawful activities.  By financing the operations, Defendant Essig effectively promoted prostitution as defined by RCW 9A.88.080.

321.    Defendant Gant violated the WCPA by assisting Defendant Simone in the trafficking of Ms. Campbell and promoting prostitution.  By advising Defendant Simone on his operations and by persisting in his intimidation tactics of Ms. Campbell, Defendant Gant effectively promoted prostitution as defined by RCW 9A.88.080.  Defendant Gant further perpetuated his abusive conduct by harassing and stalking Ms. Campbell after she left Defendant Simone, threatening her via text message and regularly appearing in public places to stalk her and monitor her activities in the months after she escaped.

322.    Defendant Howell violated the WCPA by assisting Defendant Simone in the trafficking of Ms. Campbell and promoting prostitution.  By providing material support and "muscle" to Defendant Simone's operation, including on more than one occasion, providing bodyguards to restrict Ms. Campbell's movements at Defendant Simone's direction, Defendant Howell promoted prostitution by forcing Ms. Campbell to remain in her situation.  Defendant Gant further perpetuated his abusive conduct by harassing and stalking Ms. Campbell after she left Defendant Simone, threatening her via text message and regularly appearing in public places to stalk her and monitor her activities in the months after she escaped.

323.    Defendant Commodity Properties violated the WCPA by assisting Defendant Simone in the trafficking of Ms. Campbell.  By harboring Ms. Campbell while she was being



J O H A N N E S S E N  L a w
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

trafficked by Defendant Simone, Defendant Commodity Properties was complicit in the trafficking. Defendant Commodity Properties was also complicit in the kidnapping of Ms. Campbell as it owned the office building where she was held against her will.

324.    Defendant Black Umbrella violated the WCPA by assisting Defendant Simone in the recruitment and trafficking of Ms. Campbell by serving as a corporate front for his activities and the activities of his surrogates, who all identified as "members" of Defendant Black Umbrella.

325.    Defendant Fulford violated the WCPA by assisting Defendant Simone in the trafficking of Ms. Campbell with respect to the manufacture and sale of controlled substances. Defendant Fulford was directly responsible for the manufacture of the cocaine for which Ms. Campbell was forced to perform labor in the form of recruiting purchasers.

326.    Defendant Talents violated the WCPA by assisting Defendant Simone in the trafficking of Ms. Campbell by virtue of facilitating and fostering an environment in which commercial sex acts, as defined by RCW 9A.40.100, were performed by dancers brought to them by Defendant Simone, including Ms. Campbell, against her will. Defendant Talents knew, or should have known, that such acts were occurring and were unlawful.

327.    Defendant Adams violated the WCPA by assisting Defendant Simone in the trafficking of Ms. Campbell with respect to the manufacture and sale of controlled substances. Defendant Adams was directly responsible for the distribution of the cocaine for which Ms. Campbell was forced to perform labor in the form of recruiting purchasers.

328.    Defendant Schlackman violated the WCPA by assisting Defendant Simone in the trafficking of Ms. Campbell with respect to the manufacture and sale of controlled substances.



5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

Defendant Schlackman was directly responsible for the distribution of the cocaine for which Ms. Campbell was forced to perform labor in the form of recruiting purchasers.

329.    As a result of Defendants' collective violations of the WCPA, Ms. Campbell has suffered severe emotional and physical injury.

### COUNT VII:
### CONSPIRACY (MS. CAMPBELL AGAINST ALL DEFENDANTS; MS. HILTS AGAINST DEFENDANT SIMONE AND DEFENDANT ESSIG)

330.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

331.    Each of the named Defendants conspired with Defendant Simone in the unlawful purpose to traffic Ms. Campbell, force her into prostitution, force her into involuntary servitude, and unlawfully imprison her.  The sum total of Ms. Campbell's ordeal would not have been possible without the coordinated unlawful agreement of the conspiring Defendants.

332.    As a result of Defendants' collective unlawful conduct, Ms. Campbell has suffered severe emotional and physical injury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays this Court enter judgment against all Defendants, jointly and severally, and to award damages as follows:

- Not less than one million dollars ($1,000,000) each in actual damages for the relentless pain, suffering, and mental anguish they have suffered, and continue to suffer, as a result of the Defendants' unlawful conduct;

- Treble damages as authorized by the Washington Criminal Profiteering Act, RCW 9A.82 *et seq.*;

- Reasonable attorneys' fees and investigative fees as authorized by the Washington Criminal Profiteering Act, RCW 9A.82 *et seq.*;



5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

- The costs of this action; and;

- An order restraining Defendants from engaging in any conduct prohibited by the

  Washington Criminal Profiteering Act, RCW 9A.82 *et seq*.

Signed December 20, 2021, at Seattle, Washington:

_____
Ellery Johannessen, WSBA No. 54530
Johannessen Law, PLLC
5400 California Ave. SW, Ste. E
Seattle, WA 98136
(206) 594-0479 (Direct)
ellery@eaj-law.com
Attorney for Plaintiffs

_____
Michelle T. Dellino, WSBA No. 41732
Dellino Law Group
5000 30th Ave. NE, Ste. 105
Seattle, WA 98105
(206) 659-6839 (main)
michelle@dellinolaw.com
Attorney for Plaintiffs

## **VERIFICATION**

I solemnly affirm under penalties of perjury and the laws of the State of Washington that
the statements in this Complaint are true and correct.

Angelica Campbell (Dec 21, 2021 12:07 PST)
_____
Angelica Campbell, Plaintiff

Amanda Branch (Dec 21, 2021 12:09 PST)
_____
Amanda Branch, Plaintiff

Megdalena Perez hilts (Dec 22, 2021 09:13 PST)
_____
Megdalena Perez Hilts, Plaintiff

Tessa Mortenson (Dec 21, 2021 18:09 CST)
_____
Tessa Mortenson, Plaintiff

Nabila Haji Ali (Dec 22, 2021 17:07 CST)
_____
Nabila Haji-Ali, Plaintiff

Johannessen Law
PLLC
5400 California Ave SW Ste. E Seattle, WA 98136
(206) 594-0500

# 2021.12.20 - Campbell et al. - Second Amended Complaint

Final Audit Report                                                        2021-12-22

| | |
|---|---|
| Created: | 2021-12-21 |
| By: | Ellery Johannessen (ellery@eaj-law.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAzolPi0QZt-dJPWvAdXOR6eJv51DYs8an |

## "2021.12.20 - Campbell et al. - Second Amended Complaint" History

📄 Document created by Ellery Johannessen (ellery@eaj-law.com)
2021-12-21 - 8:03:44 PM GMT- IP address: 24.18.62.211

📧 Document emailed to Angelica Campbell (hagumi1625@gmail.com) for signature
2021-12-21 - 8:05:32 PM GMT

📄 Email viewed by Angelica Campbell (hagumi1625@gmail.com)
2021-12-21 - 8:07:08 PM GMT- IP address: 74.125.209.55

✍ Document e-signed by Angelica Campbell (hagumi1625@gmail.com)
Signature Date: 2021-12-21 - 8:07:40 PM GMT - Time Source: server- IP address: 174.253.192.245

📧 Document emailed to Amanda Branch (amabranch@gmail.com) for signature
2021-12-21 - 8:07:43 PM GMT

📄 Email viewed by Amanda Branch (amabranch@gmail.com)
2021-12-21 - 8:08:47 PM GMT- IP address: 74.125.209.57

✍ Document e-signed by Amanda Branch (amabranch@gmail.com)
Signature Date: 2021-12-21 - 8:09:33 PM GMT - Time Source: server- IP address: 67.185.59.150

📧 Document emailed to Tessa Mortenson (tessamortenson@gmail.com) for signature
2021-12-21 - 8:09:35 PM GMT

📄 Email viewed by Tessa Mortenson (tessamortenson@gmail.com)
2021-12-22 - 0:09:40 AM GMT- IP address: 64.233.172.121

✍ Document e-signed by Tessa Mortenson (tessamortenson@gmail.com)
Signature Date: 2021-12-22 - 0:09:49 AM GMT - Time Source: server- IP address: 50.209.22.233

 Adobe Sign

Document emailed to Megdalena perez hilts (megdalenak@gmail.com) for signature

2021-12-22 - 0:09:51 AM GMT

Email viewed by Megdalena perez hilts (megdalenak@gmail.com)

2021-12-22 - 5:11:05 PM GMT- IP address: 66.249.84.232

Document e-signed by Megdalena perez hilts (megdalenak@gmail.com)

Signature Date: 2021-12-22 - 5:13:40 PM GMT - Time Source: server- IP address: 76.104.201.51

Document emailed to Nabila Haji Ali (nabiloali23@gmail.com) for signature

2021-12-22 - 5:13:42 PM GMT

Email viewed by Nabila Haji Ali (nabiloali23@gmail.com)

2021-12-22 - 11:06:28 PM GMT- IP address: 64.233.172.117

Document e-signed by Nabila Haji Ali (nabiloali23@gmail.com)

Signature Date: 2021-12-22 - 11:07:23 PM GMT - Time Source: server- IP address: 47.32.12.159

Agreement completed.

2021-12-22 - 11:07:23 PM GMT

**Adobe Sign**